NICOLÁS NOGUERAS CARTAGENA, demandante y peticionario, *v.* ROBERTO REXACH BENÍTEZ, CIORAH J. MONTES y CARLOS J. GUARDIOLA FIGUEROA, en su carácter del PRINCIPAL OFICIAL ADMINISTRATIVO y PRESIDENTE DEL SENADO, SECRETARIA y SARGENTO DE ARMAS, respectivamente, del SENADO DE PUERTO RICO, demandados y recurridos.

Número: MD-96-4          Resuelto: 30 de agosto de 1996

*José A. Cangiano* y *Raúl Santiago Meléndez,* abogados del peticionario; *Héctor Aníbal Castro-Pérez,* abogado de los recurridos.

— o —

Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton, a la cual se une el Juez Asociado Señor Corrada Del Río.

El Senador Nicolás Nogueras Cartagena acude ante nos mediante un recurso de *mandamus* y sostiene que su expulsión del Senado de Puerto Rico fue ilegal porque el procedimiento seguido por el Senado no garantizó un debido proceso de ley y no se cumplieron con las disposiciones constitucionales que establecen las causas de expulsión.

Esta es la primera ocasión en que este Tribunal tiene que pasar juicio sobre la disposición constitucional que faculta a cada cámara legislativa a expulsar uno de sus

miembros. Al considerar esta controversia debemos reconocer la deferencia que merecen los cuerpos legislativos en materias conducentes a disciplinar o expulsar a uno de sus miembros. No obstante, en nuestro ordenamiento constitucional tenemos la ineludible obligación de interpretar nuestra Ley Suprema. En ocasiones esto requiere pasar juicio sobre asuntos relacionados a los poderes y las facultades de las demás Ramas, Ejecutiva y Legislativa. En estos casos, nuestra labor interpretativa es ejercida con prudencia, reconociendo las competencias propias de dichos poderes, pero asegurando que cada uno cumpla con su obligación de observar la Constitución y garantizar los derechos fundamentales que en ella se consagran.

De ordinario, es al Pueblo a quien corresponde juzgar la conducta de los funcionarios electos. Este fue el sentir de los forjadores de nuestra Constitución y tal preocupación debe servir de principio rector al adjudicar la controversia sobre la expulsión del Senador Nogueras Cartagena.

Por último, debemos aclarar que la cuestión planteada ante este Tribunal es limitada. El presente recurso no es una apelación criminal en la cual se cuestiona un procedimiento penal que haya iniciado el Ejecutivo por alguna de las violaciones de ley que alegadamente cometió Nogueras Cartagena y que dieron origen al procedimiento de expulsión por el Senado. Por ende, no nos corresponde en este caso dirimir la inocencia o culpabilidad de Nogueras Cartagena en relación con los delitos imputados.

Luego de examinar detenidamente el recurso presentado, estamos de acuerdo con la sentencia emitida por este Tribunal. Veamos con detenimiento los hechos que originan la controversia ante nos, según se desprenden de los documentos sometidos por las partes y sobre los cuales no hay controversia.

I

El proceso de expulsión del Senador Nicolás Nogueras Cartagena tiene su génesis en una investigación realizada por la Oficina del Contralor de Puerto Rico. Durante una auditoría efectuada por dicha entidad gubernamental a la Oficina para la Liquidación de las Cuentas de la Corporación de Renovación Urbana y Vivienda, salió a relucir un pago efectuado.el 5 de febrero de 1993 por la cantidad de doscientos mil dólares ($200,000) a favor del Senador Nogueras Cartagena, en concepto de honorarios y como parte de una estipulación en un caso civil. Esta información fue relacionada con una auditoría que la Oficina del Contralor realizaba en el Senado de Puerto Rico.

Como consecuencia de lo anterior, la Oficina del Contralor preparó un informe de auditoría (CPED-95-16) con fecha de 28 de julio de 1995, en el cual indicó que el Senador Nogueras Cartagena pudo haber violado la ley sobre los salarios de los legisladores, Ley Núm. 13 de 24 de junio de 1989 (3 L.P.R.A. secs. 2, 34, 577, 577 n. y 2 n.; 2 L.P.R.A. secs. 28, 28 n. y 75 n.), al no informar todos los ingresos recibidos durante el 1993. El Informe concluyó lo siguiente:

> El Senador Nogueras Cartagena no incluyó los honorarios de referencia en el cómputo para la determinación de los ingresos en exceso del 35 por ciento del salario y dietas recibidos como Legislador. Al respecto, alegó en la declaración sobre ingresos que el pago recibido fue por servicios prestados antes del 1993, por lo que estaban excluidos de acuerdo con la ley. Nuestro examen reveló que parte de los $200,000 recibidos por el licenciado Nogueras Cartagena constituían ingresos por servicios prestados durante el 1993. Dichos ingresos debieron ser incluidos en la declaración jurada según se requiere en la mencionada ley. *Exhibit,* págs. 49–50.

En relación con la situación anterior, durante el mes de enero de 1996 la Contralora remitió dos (2) comunicaciones al Presidente del Senado, Roberto Rexach Benítez. En la

primera, informó al Presidente del Senado el incumplimiento del Senador Nogueras Cartagena con las normas de conducta dispuestas en el Reglamento del Senado. La otra carta tuvo el propósito de remitir una copia del Informe de Auditoría CPED-95-16 al Presidente del Senado. El informe contenía unas recomendaciones dirigidas a que el Presidente tomara las medidas necesarias para corregir las deficiencias señaladas. El Presidente del Senado le notificó a la Contralora que su primera comunicación había sido remitida al Presidente de la Comisión de Ética del Senado (en adelante Presidente de la Comisión), Senador Ramón Luis Rivera Cruz. Posteriormente, el Presidente del Senado sometió al Presidente de la Comisión, conforme dispone el Art. 11 del Código de Etica de dicho Cuerpo, el Informe de Auditoría CPED-95-16. Una copia de esta carta fue enviada al Senador Nogueras Cartagena. El Art. 11 del Código de Ética del Senado de 12 de marzo de 1993 instruye al Presidente a que una vez reciba los informes finales que rinda la Oficina del Contralor, los remita a la Comisión de Ética (en adelante Comisión) para la acción pertinente.

Tras ser evaluada la información, la Comisión le comunicó al Senador Nogueras Cartagena que dicho Cuerpo había asumido jurisdicción en el asunto y que estudiaría el Informe de Auditoría CPED-95-16. Con el propósito de evaluar el asunto, la Comisión designó al Lcdo. Luis Plaza Mariota como investigador independiente. En respuesta, el Senador Nogueras Cartagena envió una carta al Presidente de la Comisión que incluía varios documentos y en la que se reservaba planteamientos de naturaleza jurisdiccional.

Luego, el Senador Nogueras Cartagena envió otra carta al Presidente de la Comisión en la cual solicitó una primera comparecencia ante la Comisión para establecer aspectos relacionados con la falta de jurisdicción de este

cuerpo, la necesidad de que ciertos miembros de la Comisión se inhibieran y la oportunidad de explicar la falta de méritos de las imputaciones en su contra.

Oportunamente, la Comisión le comunicó al Senador Nogueras Cartagena las áreas que han de investigar (posibles violaciones al Código de Ética y a la Ley Núm. 13, *supra*) y notificó la celebración de una vista el 26 de febrero de 1996. En la misiva se indicó lo siguiente:

> Usted tendrá derecho en dicha vista a presentar, ampliar, o enmendar cualquier alegación previamente sometida por escrito a esta Comisión y podrá someter los documentos, evidencia, o prueba testimonial que estime pertinente para fundamentar sus alegaciones. Todos los derechos que le cobijan como imputado de las alegaciones previamente notificadas y los cuales aparecen enumerados en el Artículo 9, párrafo c del Código de Etica le serán celosamente salvaguardados por este Comité. Apéndice, pág. 157.

El Senador Nogueras Cartagena acudió a la vista señalada sin representación legal. Presentó una declaración por escrito en la cual, entre otras cosas, cuestionó la jurisdicción de la Comisión. En vista de sus planteamientos, la Comisión suspendió la vista y pospuso su celebración para el 29 de febrero de 1996.

Ese día, luego de iniciados los procedimientos, la vista tuvo que ser suspendida para el día siguiente por razón de un intercambio suscitado entre el Senador Nogueras Cartagena y el investigador, el licenciado Plaza Mariota. Este último renunció a su puesto y fue sustituido por el Lcdo. Ricardo Soto Goytía.

Sin embargo, el Senador Nogueras Cartagena no asistió a la continuación de la vista el 1ro de marzo de 1996. Ese día, el investigador informó a la Comisión que coincidía con el hallazgo de la Contralor sobre la violación a la Ley Núm. 13, *supra*, y sugirió, además, ampliar la jurisdicción de la Comisión para considerar posibles violaciones a la Ley Habilitadora de la Reforma Contributiva de 1994 y a

la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico (en adelante Ley de Ética Gubernamental). La Comisión le notificó al Senador Nogueras Cartagena su decisión de ampliar la investigación para añadir los señalamientos encontrados por el investigador y le concedió quince (15) días al Senador Nogueras Cartagena para refutar las nuevas imputaciones.

El Senador Nogueras Cartagena contestó la comunicación y cuestionó la facultad de la Comisión para investigar sus planillas contributivas y su incumplimiento con los requisitos de la Ley de Ética Gubernamental. Entre varias solicitudes que presentó, incluyó la celebración de una vista. Todos los cuestionamientos del Senador fueron contestados por la Comisión y, además, se le brindó la oportunidad al legislador de escoger, entre varias fechas disponibles, aquella que fuese más conveniente para celebrar la vista.

El 30 de marzo de 1996 se celebró una vista a la cual asistieron todos los miembros de la Comisión, el investigador, dos (2) testigos y el Senador Nogueras Cartagena. Este último solicitó la suspensión de la vista por no contar con la asistencia de un abogado, mas la petición fue denegada en vista de que la Comisión había ofrecido amplia oportunidad de asistir al representante legal del Senador, el Lcdo. José A. Cangiano.

Según surge de la transcripción de dicha vista, el investigador, licenciado Soto Goytía, presentó dos (2) testigos. El primero fue el Sr. Tyron Ortiz Hernández, Especialista en Auditoría III en la Oficina del Contralor, quien trabajó en la auditoría del Senado conducente a la preparación del Informe de Auditoría. El segundo testigo fue Félix Arroyo, Subdirector del Negociado de Contribución sobre Ingresos del Departamento de Hacienda, quien prestó testimonio en relación a la presentación tardía de planillas por parte del Senador Nogueras Cartagena para los años contributivos 1991, 1992 y 1993.

El procedimiento utilizado fue el interrogatorio de cada uno de los testigos por parte del investigador de la Comisión, brindándole al Senador Nogueras Cartagena la oportunidad de contrainterrogarlos. Ocasionalmente, los miembros de la Comisión hicieron preguntas o solicitaron aclaraciones. En cuanto a las objeciones presentadas por las partes, deberían ser presentadas por escrito y serían consideradas posteriormente por la Comisión.

De la transcripción se desprende que ésta se celebró con propiedad y que el Senador Nogueras Cartagena tuvo la oportunidad de contrainterrogar con gran amplitud y sin limitación alguna a los dos testigos presentados por el investigador. Aun cuando tenía derecho a ello, el Senador no presentó testigos a su favor.

Después de la vista, la Comisión le envió al Senador Nogueras Cartagena un documento de cuatro (4) páginas titulado "Alegaciones sobre Violación a la Ley de Etica Gubernamental", en el cual se presentaban los fundamentos que utilizaba la Comisión para sostener que él había violado la Ley Núm. 12 de 24 de julio de 1985 (3 L.P.R.A. sec. 1831 *et seq.*). Los hallazgos al respecto fueron los siguientes: el Senador Nogueras Cartagena presentó sus informes financieros en la Oficina de Ética Gubernamental tardíamente; se excedió sin justa causa de las prórrogas concedidas por dicha oficina; presentó sus informes de 1991 y 1992 el 15 de septiembre de 1993; presentó su informe de 1993 el 27 de febrero de 1995, y el correspondiente a 1994, el 26 de junio de 1995. Esta alegada conducta infringió el mandato de dicha ley, la cual considera constitutivo de *delito grave* el dejar de presentar los informes. 3 L.P.R.A. sec. 1841.

El 17 de abril de 1996 la Comisión notificó al Senador Nogueras Cartagena las determinaciones que dicho cuerpo había realizado en relación con las objeciones que tanto el Senador como el investigador de la Comisión presentaron durante la vista de 30 de marzo. Las objeciones del Sena-

dor fueron declaradas sin lugar por entender la Comisión que el Senador las aceptó al no refutarlas dentro del término concedido para ello.

Varios días después, la Comisión de Ética del Senado rindió su informe final. En él se hizo una explicación detallada de cómo adquirió jurisdicción en el proceso y un historial de todo lo acontecido desde la presentación del Informe de Auditoría por la Oficina del Contralor. El Informe de la Comisión tiene las siguientes determinaciones:

> 1) El Senador Nogueras violó la Ley 13 de 24 de junio de 1989, al no sólo omitir informar sus ingresos netos correspondientes al año 1993, sino al radicar tardíamente su declaración jurada conforme a esta ley en el año 1993.
> 2) El Senador Nogueras incurrió en delito grave al violar la Ley de Etica Gubernamental al no radicar sus informes correspondientes al 1992, 1993 y 1994 conforme lo dicta la ley.
> 3) El Senador Nogueras infringió el artículo 4 inciso c y el artículo 7 del Código de Etica.
> 4) El Senador Nogueras incurrió en delito grave al violar la Ley de Contribuciones sobre Ingresos al no radicar sus planillas correspondientes a los años 1992 y 1993 conforme a la ley. *Exhibit*, págs. 23–24.

La Comisión recomendó la expulsión del Senador. No obstante, al momento de presentar sus recomendaciones, los fundamentos fueron más limitados. Por constituir la parte relevante del informe, a continuación reproducimos textualmente su parte final.

> Establecida nuestra facultad, procede examinar la razonabilidad de nuestra recomendación. A estos efectos es necesario discutir las causas que podrían aparejar una expulsión de un Cuerpo Legislativo.
> Como señalamos nuestra Constitución en su artículo III sec. 9 establece claramente que las causas de expulsión serán las mismas para el residenciamiento contenidas en el artículo III sec. 21 que son: traición, soborno, otros delitos graves y aquellos delitos menos grave que impliquen depravación.
> Los hallazgos contenidos en este informe revelan sin lugar a dudas que el Senador Nogueras incurrió en conducta constitutiva de delito grave al violar la Ley de Etica Gubernamental,

razones suficientes en derecho para recomendar la expulsión del Senador.

Sin embargo, las circunstancias particulares a este asunto. añaden el elemento de depravación moral.

Según ha sido definida consiste la depravación moral en un estado o condición del individuo, compuesto por una deficiencia inherente de su sentido de la moral y la rectitud; en que la persona ha dejado de preocuparse por el respeto y la seguridad de la vida humana y todo lo que hace es esencialmente malo, doloso, fraudulento, inmoral, vil en su naturaleza y dañino en sus consecuencias. *Morales Merced vs. Tribunal Superior 93 D.P.R. 423 (1966)*.

Por su parte, los tribunales federales y estatales de los Estados Unidos han definido la depravación o torpeza moral ("moral turpitude") como: "... an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men on duty between man and man." to the accepted and customary rule of right (6th Cir. 1973); United States ex rel. Ciarello vs. Reimer, 32 F. Supp. 797.

El patrón de incumplimiento de éstas [sic] leyes por parte del Senador denota sin lugar a dudas un grave menosprecio a las leyes y a nuestro ordenamiento social.

En cuanto al procedimiento utilizado, debemos señalar que es uno distinto al de residenciamiento. En el caso de legisladores se trata de expulsión, la cual es decretada por el Cuerpo mediante el proceso de votación por tres cuartas partes del total de los miembros. La celebración de un juicio de residenciamiento no es un requisito exigido por la Constitución.

Por todo lo cual, vuestra Comisión de Etica muy respetuosamente recomienda la expulsión del Senador Nicolás Nogueras Cartagena del Senado de Puerto Rico. *Exhibit*, págs. 26–27.

El Senado señaló en su calendario la discusión del Informe de la Comisión para el jueves 25 de abril de 1996. El día antes, la Comisión de Reglas y Calendario celebró una reunión ejecutiva en la cual adoptaron reglas especiales para la consideración del Informe.

Llegado el 25 de abril, el Senado de Puerto Rico entró en sesión y consideró el Informe de la Comisión de Ética. Luego de denegar una solicitud de aplazamiento presentada por la representación legal de Nogueras Cartagena y tras la consideración de otros trámites parlamentarios, el

Presidente de la Comisión de Ética realizó una presentación oral del informe rendido por dicho organismo.

Finalizada la presentación de los cargos, al Senador Nogueras Cartagena se le concedió tiempo en exceso de una hora para exponer su posición. Luego de esto, once (11) Senadores hicieron uso de su derecho a expresarse. Cada uno consignó su parecer con relación a los cargos y el procedimiento.

Una vez los Senadores consumieron sus turnos, a Nogueras Cartagena se le concedieron treinta (30) minutos para hacer su exposición final. Igual tiempo tuvo después el Presidente de la Comisión de Ética, quien al final de su turno presentó formalmente una moción para que el Senado de Puerto Rico decretara la expulsión del Senador Nogueras Cartagena. Con una votación de veintitrés (23) a favor y seis (6) en contra, la moción fue aprobada y, por consiguiente, Nogueras Cartagena fue expulsado del Senado de Puerto Rico.

Una semana después, Nogueras Cartagena presentó ante este Tribunal un recurso de *mandamus*. En esencia, alega que el Senado de Puerto Rico, en incumplimiento con el deber ministerial de instrumentar y ejecutar el mandato de la Constitución de Puerto Rico en sus Secs. 9 y 21 del Art. III, L.P.R.A., Tomo 1, actuó en contravención de lo allí dispuesto y que procede, por lo tanto, su reinstalación al puesto de Senador. En particular, sostiene que la Constitución requiere una convicción previa por un delito grave antes de que una de las cámaras legislativas pueda iniciar la expulsión de uno de sus miembros. Además, alega que el procedimiento de expulsión no cumplió con las garantías constitucionales del debido proceso de ley.

Por su parte, el Presidente del Senado, Hon. Roberto Rexach Benítez, y los otros funcionarios de esa cámara comparecieron solicitando la desestimación del recurso por falta de jurisdicción y se opusieron a la expedición del *mandamus*. Hemos examinado con detenimiento los escri-

tos de las partes, además de todos los documentos que obran en el expediente. Después de ponderar ambas posiciones a la luz del derecho aplicable, coincidimos con el curso decisorio tomado por este Tribunal al denegar la expedición del auto.

## II

En el ámbito procesal, el Presidente del Senado y los otros demandados solicitan la desestimación del recurso incoado, alegando la improcedencia del auto de *mandamus* y la no justiciabilidad de la controversia. Hemos evaluado cuidadosamente los fundamentos expuestos por los demandados, pero no coincidimos con todos sus criterios.

A. El *mandamus* es un auto discrecional y altamente privilegiado mediante el cual se ordena a un funcionario público el cumplimiento de un acto que en dicho auto se exprese y que esté dentro de sus atribuciones o deberes. 32 L.P.R.A. sec. 3421. Es uno de los autos que este Tribunal puede expedir en jurisdicción original. Sec. 5 del Art. V de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1; Arts. 649 y 650 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3421–3422. En su origen histórico, el *mandamus* tuvo como uso clásico y original la reposición de alguien ilegalmente destituido de su puesto. D. Rivé Rivera, *Recursos Extraordinarios*, Atlanta, Darby Printing Co., 1989, pág. 81. En ese mismo sentido hemos tenido la oportunidad de expresar en varias ocasiones que "[e]l *mandamus* es un remedio adecuado para impedir que un funcionario o junta separe de su empleo a un funcionario o empleado, sin autoridad para ello". *Soto v. Alcalde Municipio de Bayamón*, 99 D.P.R. 415, 420 (1970).

El *mandamus* aquí solicitado está dirigido contra tres (3) funcionarios: Roberto Rexach Benítez, en su carácter de Principal Oficial Administrativo y Presidente del Senado;

Ciorah J. Montes, Secretaria del Senado, y Carlos J. Guardiola, Sargento de Armas del Senado. De inicio, procede desestimar la acción en lo que respecta al Presidente del Senado. Sus actuaciones en el caso de autos están enmarcadas dentro de sus funciones como legislador y están cobijadas por la doctrina de inmunidad parlamentaria. Sec. 14 del Art. III de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. La protección constitucional no es menor por tratarse del Presidente de un cuerpo legislativo.

En lo que respecta a la Secretaria del Senado y al Sargento de Armas, en el caso de autos sus actuaciones no están cobijadas por la inmunidad parlamentaria y pueden ser objeto de una acción judicial. En la jurisdicción federal se reconoce que la inmunidad parlamentaria no protege a estos oficiales en este tipo de casos. ("That House employees are acting pursuant to express orders of the House does not bar judicial review of the constitutionality of the underlying legislative decision." *Powell v. McCormack*, 395 U.S. 486, 504 (1969).) Igual fue nuestro proceder en *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977), caso que decidimos a la luz de la Constitución del Estado Libre Asociado de Puerto Rico y en el cual la acción, dirigida a impugnar la decisión de un cuerpo legislativo, fue presentada contra el Secretario del Senado.

En su escrito de oposición, los demandados citan a *De Diego et al. v. La Cámara, Etc.*, 5 D.P.R. 114 (1904), para sostener que un *mandamus* "no puede expedirse para obligar al Senado a efectuar un acto contrario a su discreción". Solicitud de desestimación por falta de jurisdicción y oposición a recurso de mandamus, pág. 6. En aquel caso resolvimos que la entonces Cámara de Delegados de la Asamblea Legislativa no estaba sujeta al auto de *mandamus*. Sin embargo, en *De Diego et al.*, supra, el *mandamus* estaba dirigido contra la Cámara de Delegados como cuerpo legislativo y no contra sus oficiales, como sería el Sargento de Armas o el Secretario.

Por último, debemos puntualizar como característica principal del *mandamus* su condición de recurso extraordinario discrecional. Al considerar su expedición, el "factor de mayor importancia y peso es el del posible impacto al interés público". *Noriega v. Hernández Colón*, 135 D.P.R. 406, 448 (1994). Nogueras Cartagena sostiene que el Senado de Puerto Rico actuó en incumplimiento de su deber ministerial de instrumentar y ejecutar el mandato constitucional contenido en las Secs. 9 y 21 del Art. III de la Constitución del Estado Libre Asociado, *supra*. Al examinar este caso, hemos reconocido el innegable interés público que éste ha generado y su importancia dentro de nuestro sistema político y constitucional. *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264, 274–275 (1960).

Aclarada la normativa aplicable en torno a la procedencia del *mandamus* presentado por Nogueras Cartagena, evaluemos el planteamiento de cuestión política.

B.   Una de las instancias en que una controversia no es justiciable es cuando se trata de una cuestión política. "La doctrina de cuestión política plantea, en esencia, 'que hay asuntos que no son susceptibles de determinación judicial porque su resolución corresponde a las [otras] ramas ... del gobierno —la legislativa o la ejecutiva— o, en última instancia, al electorado'. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 679. Véanse: *Baker v. Carr*, 369 U.S. 182 (1962) ...." *Noriega v. Hernández Colón*, supra, pág. 422. En el caso de autos está en juego la validez de la expulsión de un legislador, realizada por el Senado de Puerto Rico al amparo de una disposición facultativa contenida en el texto de la Constitución: "Cada cámara ... con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencia en la sección

21 de este Artículo." Sec. 9 del Art. III de la Constitución de Puerto Rico, *supra*, ed. 1982, pág. 340. ¿Tienen estas palabras el efecto de excluir el adecuado ejercicio de nuestra función judicial interpretativa?

En *Santa Aponte v. Srio. del Senado*, supra, nos enfrentamos a un planteamiento similar al que hacen los demandados alegando la no justiciabilidad de la controversia en disputa. En aquella ocasión tuvimos que decidir si la disposición constitucional en la que se expresa que "[c]ada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección" (Art. III, Sec. 9, Const. E.L.A., *supra*, pág. 340), era impedimento para el ejercicio de nuestra facultad revisora. Resolvimos que al igual que la disposición homóloga de la Constitución federal no es barrera que impida la intervención judicial, *Powell v. McCormack*, supra, nuestra cláusula constitucional no convierte a los cuerpos legislativos en "los jueces constitucionales de sus propios poderes. Es a los tribunales a quienes les toca interpretar las leyes y la Constitución". *Santa Aponte v. Srio. del Senado*, supra, pág. 760. Más tarde, en *Silva v. Hernández Agosto*, 118 D.P.R. 45, 55 (1986), sostuvimos que "[n]uestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos".

Si bien las otras dos ramas de gobierno poseen competencias propias de naturaleza constitucional, éstas no pueden ser ejercidas de forma contraria a lo que dicta la Constitución. Bajo nuestro sistema de gobierno, la interpretación final al respecto le corresponde al Poder Judicial. La propia parte demandada reconoce en su escrito de oposición "la naturaleza *privilegiada* de la *autonomía legislativa* en lo referente a la expulsión de los legisladores, *siempre y cuando se ciña dentro de los parámetros constitucionales* ...". (Énfasis en el original suprimido y énfasis suplido.) Solicitud de desestimación por falta de jurisdicción y oposición a recurso de mandamus, pág. 12.

Para garantizar la supremacía constitucional, la Constitución del Estado Libre Asociado de Puerto Rico otorgó al Tribunal Supremo la autoridad exclusiva de dictaminar la constitucionalidad de las leyes y los actos de los otros poderes. De esta manera, la Asamblea Constituyente aseguró que el control eficaz de la constitucionalidad de los actos del Estado estuviese en el Tribunal Supremo, como último intérprete de la Constitución.

Además, en este caso la Constitución específicamente limita los fundamentos de expulsión de los legisladores a las causas de residencia y existen normas judiciales apropiadas para resolver las controversias que se originen en su aplicación a casos concretos. Aclaramos que nuestra función en el caso de autos no es la típica revisión apelativa y no se trata de resolver si la determinación final se ajustó a los hechos y a la prueba.

Tenemos que asegurar que se cumplan estrictamente con las disposiciones pertinentes de la Constitución que rigen el proceso y las causas de expulsión, y evitar que una mayoría abuse de este extraordinario y excepcional poder. Esencialmente, hay que hacer una interpretación de las disposiciones constitucionales aplicables y determinar si el proceso de expulsión utilizado en este caso cumplió con las garantías del debido proceso de ley. Al cuestionarse la integridad del proceso legislativo y considerando que el demandante es un funcionario electo, es imperioso que no se viole el debido proceso de ley. Véase *Santa Aponte v. Srio. del Senado*, supra, pág. 764. Un razonamiento similar ha sido utilizado en otras jurisdicciones. Véanse: *Gerald v. Louisiana State Senate*, 408 So. 2d 426 (1981); *Sweeney v. Tucker*, 375 A.2d 698, 709 (Penn. 1977); *McCarley v. Sanders*, 309 F. Supp. 8 (M.D. Ala. 1970). De criterio contrario, véase *In re Opinion of the Justices,* 47 So. 2d 586 (1960).

Finalmente, determinar las normas mínimas que deben regir el proceso de expulsión de un legislador no constituye una indebida intromisión en los trabajos de la Asamblea

Legislativa. En ocasiones anteriores hemos reconocido que "no podemos convertirnos en árbitros de todas las disputas internas que tienen los legisladores sobre la interpretación y aplicación de reglas legislativas relativas a procedimientos puramente parlamentarios. Sin embargo, no estamos abdicando a nuestra facultad de ser los máximos interpretes de las actuaciones legislativas. Dicha facultad la ejerceremos cuando las actuaciones de otras ramas de gobierno presenten claros problemas de constitucionalidad y no meras disputas procesales o interpretativas". *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497, 533–534 (1994).

En este caso el Senador Nogueras Cartagena acudió ante nos impugnando tanto las causas de la expulsión como el procedimiento. Considerando que Nogueras Cartagena fue debidamente electo por el Pueblo de Puerto Rico para ocupar un escaño en el Senado y que su expulsión priva a sus electores de una representación legislativa, los tribunales tenemos una obligación ineludible de considerar sus señalamientos y garantizar que se cumplió con los controles constitucionales que rigen este proceso. La determinación final de esta controversia es un asunto para el cual este Tribunal está preparado y tenemos la autoridad constitucional para tomar una decisión.

Visto que el auto solicitado procede en derecho, que la controversia es justiciable y expuesto el ámbito de nuestra función revisora en este tipo de casos, veamos los méritos del recurso.

## III

La Sec. 9 del Art. III de nuestra Constitución, *supra*, pág. 340, dispone lo siguiente:

> Cada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección; elegirá sus funcionarios, adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno in-

*terno; y con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencia en la sección 21 de este Artículo.* Cada cámara elegirá un presidente de entre sus miembros respectivos. (Énfasis suplido.)

Esta sección, además de disponer de forma general sobre el gobierno interno de cada cuerpo legislativo, expresamente contiene el proceso parlamentario de expulsión de los legisladores. En *Santa Aponte v. Srio. del Senado,* supra, tuvimos la oportunidad de pasar juicio sobre parte de la Sec. 9, *supra.* En aquella ocasión era objeto de controversia la *exclusión* de un legislador. Ante la impugnación de la elección de Santa Aponte, el Senado decidió excluirlo y no reconocerle su condición de Senador hasta la adjudicación final del asunto. Al resolver, hicimos especial hincapié en distinguir las distintas situaciones que plantean de un lado la *exclusión* de un legislador y, del otro, su *expulsión.*

A. La prerrogativa Parlamentaria de expulsión que contiene nuestra Constitución se remonta al Parlamento británico del siglo XVI e históricamente se consideró una facultad sumamente amplia. D.D. Ellis, Jr., *Powell v. McCormack and the Power to Expel: Some Unanswered Questions Regarding the Framers' Intent,* 5 Ga. L. Rev. 203 (1971). El examen de casos de expulsión en Inglaterra previo a 1787 muestra que el Parlamento asumía una discreción casi absoluta al momento de decidir la expulsión de uno de sus miembros. Los procesos se caracterizaban por la falta de criterios en torno al tipo de conducta merecedora de tal sanción. D. Bowman y J.F. Bowman, *Article I, Section 5: Congress' Power to Expel—An Exercise in Self-Restraint,* 29 Syracuse L. Rev. 1071, 1075 y 1083 (1978).

Al adoptarse la Constitución de Estados Unidos, se reconoció la facultad de expulsión de cada Cámara. La Sec. 5 del Art. 1 de la Constitución federal, L.P.R.A., Tomo 1, ed. 1982, pág. 171, dispone: "Cada Cámara adoptará su regla-

mento, podrá castigar a sus miembros por conducta impropia y expulsarlos con el voto de dos terceras partes." La discreción que acompañaba originalmente el proceso de expulsión fue limitada procesalmente en el caso de la Constitución federal mediante el requisito expreso de una mayoría cualificada. L.K. Bay, *Discipline Through Delegation: Solving the Problem of Congressional Housecleaning*, 55 U. Pitt. L. Rev. 389, 392–393 (1994).

En términos generales, la expulsión es uno de los poderes que tiene cada cámara del Congreso federal para disciplinar a sus miembros. G.T. McLaughlin, *Congressional Self-Discipline: The Power to Expel, to Exclude and to Punish*, 41 Fordham L. Rev. 43 (1972). En cuanto a las causas de expulsión, se ha reconocido la discreción de cada Cámara para determinarlas. *In Re Chapman*, 166 U.S. 661, 669–670 (1897). Históricamente, los casos en el Congreso que han resultado en expulsión han tratado de condùctas tales como conspiración, deslealtad y corrupción. *How Congress Works*, 180 (Congressional Quarterly, Inc. 1983).

En el caso de Puerto Rico, hasta la adopción de la Constitución en 1952, nuestro ordenamiento carecía de una disposición que expresamente contuviera la expulsión de legisladores. Dentro de nuestra limitada autonomía interna, la Ley Orgánica —Acta Jones, 39 Stat. 951, Documentos Históricos, Art. 32, L.P.R.A., Tomo 1, ed. 1982, pág. 106— reconocía que las cámaras serían "los únicos jueces de las elecciones, escrutinios y capacidad de sus miembros, y tendrán y ejercerán todas las atribuciones, con respecto a la dirección de sus procedimientos, que usualmente corresponden a cuerpos legislativos parlamentarios". Véase el Art. 32 de la Ley Orgánica, Acta Jones, *supra*, la cual siguió lo dispuesto en la Sec. 30 del Acta Foraker, 31 Stat. 77, Documentos Históricos, Sec. 30, L.P.R.A., Tomo 1.

A tenor con este esquema, en el informe a la Asamblea Constituyente, intitulado *La Nueva Constitución de Puerto Rico*, la Escuela de Administración Pública reconoció que

"[t]oda legislatura debe tener la facultad de imponer medidas disciplinarias a sus miembros". *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, Parte II, pág. 378. Señaló que este poder había sido usado por las Legislaturas en muy pocas ocasiones y recomendó que no se enumeraran las causas de suspensión y expulsión. Sin embargo, sugirió que se incluyera la regla de una votación de al menos dos terceras partes (2/3), pues de ese modo se otorgaría cierta protección a los miembros contra posibles excesos de la mayoría.

La Comisión de la Rama Legislativa de la Convención Constituyente endosó esta recomendación, pero propuso la enumeración de las causales para la expulsión. En particular, la Comisión recomendó el texto siguiente: "Cada cámara tendrá autoridad para disciplinar cualquiera de sus miembros y, con la concurrencia de dos terceras partes, decretar la expulsión de un miembro por las mismas causas señaladas para el residenciamiento."

Los comentarios de la Comisión son muy ilustrativos sobre los principios rectores de esta propuesta:

> En segundo lugar, y relacionado con el procedimiento de expulsión de miembros de las cámaras, es el criterio de la Comisión que debe ser responsabilidad de los electores, dentro de los procedimientos ordinarios de elección, determinar si un legislador debe o no volver a ocupar su cargo. Defender ese principio conlleva reconocer la autoridad democrática final del pueblo para entender en estos problemas. Considerando, sin embargo, que puede haber situaciones especiales que hagan imperativa la expulsión de un legislador por sus compañeros de cámara, *la Comisión recomienda se permita tal procedimiento, rodeándolo de dos garantías básicas: exigir la aprobación de dos terceras partes de los miembros y estipular en la constitución las causas de expulsión, que deben ser las mismas que motivan el residenciamiento.* (Énfasis suplido.) 4 Diario de Sesiones de la Convención Constituyente 2581 (1961).

Por su parte, con unas modificaciones, la Convención acogió la recomendación de la Comisión sobre la necesidad de incluir estas garantías básicas para evitar los abusos de

una mayoría. Con el propósito de hacer más difícil la expulsión, la Convención modificó los requisitos de votos para exigir el concurso de por lo menos tres cuartas partes (3/4) del número total de miembros del Cuerpo.

Contrario al caso federal y a la mayoría de las jurisdicciones estatales, no se incluyó como causa para la expulsión la conducta impropia de un legislador. En lugar de adoptar esta causa tan amplia, se decidió por las aplicables al residenciamiento del Gobernador, el Contralor y los Jueces de este Tribunal, dispuestas en la Sec. 21 del Art. III de la Constitución del Estado Libre Asociado, *supra.*

Puerto Rico fue la primera jurisdicción en adoptar estos límites sobre el poder de expulsión de una mayoría parlamentaria. *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico*, Washington, D.C., 1952, págs. 60–61. Debido a que desde que se aprobó la Constitución ningún legislador había sido expulsado, el caso de autos nos obliga a examinar el alcance de estas garantías básicas que tiene todo legislador electo en Puerto Rico.

B. La Sec. 21 del Art. III de la Constitución, *supra*, págs. 346–347, dispone lo siguiente:

> La Cámara de Representantes tendrá el poder exclusivo de iniciar procesos de residencia y con la concurrencia de dos terceras partes del número total de sus miembros formular acusación. El Senado tendrá el poder exclusivo de juzgar y dictar sentencia en todo proceso de residencia; y al reunirse para tal fin los Senadores actuarán a nombre del pueblo y lo harán bajo juramento o afirmación. No se pronunciará fallo condenatorio en un juicio de residencia sin la concurrencia de tres cuartas partes del número total de los miembros que componen el Senado, y la sentencia se limitará a la separación del cargo. La persona residenciada quedará expuesta y sujeta a acusación, juicio, sentencia y castigo conforme a la ley. *Serán causas de residencia la traición, el soborno, otros delitos graves, y aquellos menos graves que impliquen depravación.* El Juez Presidente del Tribunal Supremo presidirá todo juicio de residencia del Gobernador.
>
> Las cámaras legislativas podrán ventilar procesos de residencia en sus sesiones ordinarias o extraordinarias. Los presi-

dentes de las cámaras a solicitud por escrito de dos terceras partes del número total de los miembros que componen la Cámara de Representantes, deberán convocarlas para entender en tales procesos.

Aunque la disposición sobre las causas de residencia parece ser homóloga a la federal, su alcance es mucho más limitado. En el texto en inglés de la Sec. 4 del Art. II de la Constitución federal, 1 U.S.C., se dispone lo siguiente:

> The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors. Const. EE. UU., Art. II, Sec. 4, págs. LVI–LVII.

El alcance de las causas para residenciar a nivel federal, en particular el significado del concepto *high crimes and misdemeanors*, ha sido objeto de innumerables debates en Estados Unidos. 2 *Rotunda, Nowak y Young, Treatise on Constitutional Law: Substance and Procedure* Sec. 8.14 (1992); L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 289–296; R. Berger, *Impeachment: The Constitutional Problems*, Massachusetts, Harvard University Press, 1973, Cap. II; M.J. Gerhardt, *The Constitutional Limits to Impeachment and Its Alternatives*, 68 Tex. L. Rev. 1, 82–89 (1989); Nota, *The Scope of the Power to Impeach*, 84 Yale L.J. 1316 (1975). Entre la opinión más ilustrada en derecho constitucional existe un consenso en que *high crimes and misdemeanors* no se refiere a leyes criminales y, por lo tanto, no supone una convicción o acusación previa al proceso de residenciamiento. No obstante, se entiende que tampoco se trata de cualquier conducta, pues se pretendió evitar otorgarle a cada cámara un poder absoluto de expulsar a uno de sus miembros por cualquier tipo de conducta impropia: "The last thing intended by the Framers was to leave the Senate free to declare any conduct whatsoever a 'high crime and misdemeanor.' " Berger, *op. cit.*, pág. 106.

Por ello, *siempre se ha entendido que los actos que se*

*pretendía penalizar con el residenciamiento eran aquellos
cometidos por funcionarios públicos contra el Estado y la
función pública, de naturaleza similar al soborno y a la
traición*:

> There can be little argument that treason and bribery are
> proper grounds for impeachment since they are both indictable
> offenses and involve a breach of the public trust. The meaning
> of the phrase "other high crimes and misdemeanors," however,
> is less clear. The use of the word "other" seems to imply that
> any additional grounds for impeachment should be of the same
> serious nature as treason and bribery and involve official
> misconduct. From the constitutional debates, it is evident that
> the impeachment provisions were aimed at preventing "the
> possibility of tyrannical, oppressive, corrupt and willful use of
> the power connected with a public office." *Thus, to be impeacha-
> ble, the conduct in question must either be an indictable offense
> which involves serious consequences to the United States or, if
> not an indictable offense, one which involves malicious or co-
> rrupt acts in the discharge of official duties, causing great de-
> triment to the United States.* (Énfasis suplido y escolios
> omitidos.) McLaughlin, *supra*, pág. 49. Véase Gerhardt, *supra*,
> pág. 84.

En Puerto Rico, la primera disposición de rango consti-
tucional que contuvo lo referente al residenciamiento se
adoptó con motivo de la Ley Pública Núm. 362 de 1947,
conocida como Ley del Gobernador Electivo, y que en-
mendó la Ley Orgánica (Acta Jones). Mediante la Ley Pú-
blica Núm. 362, *supra*, el Congreso de Estados Unidos le
concedió al Pueblo de Puerto Rico la oportunidad de elegir
su propio Gobernador. Previo a la adopción del estatuto
federal, el Gobernador era nombrado por el Presidente de
Estados Unidos con el consejo y consentimiento del Senado
federal. Acta Jones, *supra*, Art. 12. Como era un funciona-
rio público del gobierno federal cuya permanencia estaba
sujeta a la voluntad del Presidente, resultaba innecesario
establecer un procedimiento de residenciamiento.

Al conceder la Ley del Gobernador Electivo el poder a
los electores de Puerto Rico de elegir su Gobernador, fue
entonces necesario adoptar el método tradicional de desti-

tución de este tipo de mandatario, esto es, el residenciamiento. De este modo, y siguiendo el modelo de la Constitución federal, se incorporó un artículo 12a a la Ley Orgánica cuya primera oración disponía lo siguiente: "The Governor shall be removed from office on impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors." Ley Orgánica de Puerto Rico–Enmienda, Ley Pública Núm. 362, Sec. 2, 61 Stat. 771, 768 (1947). La oración fue traducida al español del modo siguiente: "El Gobernador será destituido de su cargo mediante residenciamiento por, y convicción de, traición, soborno y otros delitos graves y delitos menos graves." Acta Jones, Documentos Históricos, *supra*, Art. 12a, pág. 91 Este fue el modelo utilizado por la Convención Constituyente en 1952 para redactar lo que finalmente se convirtió en la Sec. 21 del Art. III de nuestra Constitución, *supra*. *Notes and Comments on the Constitution of the Commonwealth of Puerto Rico*, supra, págs. 74–75.

De este historial claramente surgen unas diferencias significativas entre las disposiciones de residenciamiento de la Constitución federal y la nuestra. Mientras que en la federal se residencia por *high crimes and misdemeanors*, en Puerto Rico tiene que ser por "otros delitos graves, y aquellos menos graves que impliquen depravación". Las causas dispuestas en la federal no son jurídicamente correlativas a los términos "delitos graves y delitos menos graves". Además de que en su origen la terminología federal tenía el sentido particular de una ofensa o abuso de la función y confianza públicas, se trata de un concepto de la cultura legal del *common law*. J. Story, *Commentaries on the Constitution of the United States*, Boston, Little, Brown and Co., 1891, Vol. I, Secs. 403–404.

En cambio, en nuestro ordenamiento civilista, el uso de los términos "delitos graves y menos graves" posee un significado claro: se refiere a leyes penales, ya sean las contenidas en el Código Penal o en los distintos estatutos de

naturaleza especial que hayan sido aprobadas con anterioridad a los hechos imputados. *A diferencia de las causas del residenciamiento federal, la única interpretación posible de nuestro texto constitucional es que se requiere la configuración de un delito estatuido.*

De otro lado, decir que los delitos que han de utilizarse como base para un residenciamiento y, por lo tanto, una expulsión deben ser constitutivos de una infracción penal, no significa que se trate de cualquier delito. En el caso de los menos graves, de ninguna manera se trata de *todos*, sino que se limitan a "aquellos ... que impliquen depravación". Trías Monge identifica la restricción, en cuanto a los delitos menos graves cuya naturaleza denote depravación, como una de las innovaciones adoptadas en relación con el lenguaje original del Art. 12a del Acta Jones, *supra*, Sec. 12a. J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 164. En este caso, sin embargo, no es necesario expresarnos en cuanto a cuáles de los delitos menos graves tipificados implican depravación y constituyen por ello motivo de expulsión. Esto, debido a que los fundamentos utilizados por el Senado para la expulsión aquí impugnada no incluían la comisión, al momento de los hechos, de un delito menos grave.

En lo referente a los delitos graves, ¿cuáles son los "otros" a los que el texto hace referencia? Como ya señaláramos, es claro que no se trata de cualquier delito grave. Al igual que en el caso federal, en que se utilizó el calificativo *other* y no se hizo referencia a todos o cualquier *felony*, nuestros constituyentes optaron por el adjetivo "otros", aun pudiendo utilizar frases amplias como "los delitos graves" o "los demás delitos graves".

Al interpretar esta disposición debemos considerar el origen de nuestra cláusula sobre residenciamiento y cómo se relaciona con el resto del texto constitucional. Como ya señaláramos, en el caso federal las causas de residencia-

miento están limitadas a las conductas que representen ofensas serias de la misma gravedad que la traición y el soborno. Vista la redacción de nuestra disposición constitucional, no hay razón para atribuir a las causas de la Sec. 21 de la Constitución del Estado Libre Asociado, *supra*, un significado más laxo. Aunque el debate de la Constituyente es parco, al tomar en consideración el conjunto completo del texto constitucional y su propósito, la interpretación más razonable es que "otros delitos graves" se refiere a cierto tipo de delito grave que, al ser cometido por funcionarios públicos, reflejan tal ausencia de juicio, menosprecio hacia el bienestar común o falta de respeto por la ley, que implican la carencia del nivel mínimo de integridad y juicio para desempeñar las responsabilidades del cargo que se ocupa. Por su naturaleza se trata de conductas que atentan contra la función o la confianza pública. Sin pretender ser exhaustivo, claramente cumplirían con estos criterios los delitos que atenten contra la función pública, tales como los delitos contra fondos públicos (Art. 216 del Código Penal, 33 L.P.R.A. sec. 4391), influencia indebida (Art. 213 del Código Penal, 33 L.P.R.A. sec. 4364), y otros que denoten una clara y palpable falta de integridad o depravación moral, tales como el asesinato o la violación. La identificación de estos delitos puede variar con el tiempo. Después de todo, no puede pretenderse que los delitos graves existentes en 1952 fueran encapsulados en el tiempo como únicas causas de residenciamiento y expulsión.

Sin embargo, por la naturaleza del poder constitucional de expulsión de sus miembros, como norma general cada Cámara es la que puede evaluar si los hechos imputados configuran uno de los delitos graves estatuidos que impidan que el legislador pueda continuar ocupando su escaño. Considerando que se trata de un poder para asegurar la integridad de cada Cuerpo y que su ámbito está limitado a sus miembros y reglamentado, en este caso, por el Senado en su Código de Ética, la determinación cameral merece

especial deferencia por el Poder Judicial. No estamos ante un proceso criminal que expone al imputado a una pena de cárcel y que es revisable judicialmente por vía de apelación. Constitucionalmente nuestra función es distinta en ambos casos y, por consiguiente, los criterios judiciales no son iguales.

Por último, al igual que la federal y la mayoría de las estatales, nuestra Constitución no requiere una convicción previa. Así también se dispone en los casos de residenciamiento, cuyas disposiciones constitucionales, vistas de forma integral, son indicativas de la ausencia de un requisito de convicción. En una parte de la Sec. 21 del Art. III de la Constitución del Estado Libre Asociado, *supra*, pág. 347, se dispone: "La persona residenciada quedará expuesta y sujeta a acusación, juicio, sentencia y castigo conforme a la ley." Este lenguaje, al contener y autorizar la celebración de un procesamiento criminal posterior al residenciamiento, claramente supone que no es necesaria la convicción previa.

Aunque ciertas expresiones realizadas durante el debate de la Constituyente pudieran dar paso a interpretar que se exige una convicción previa antes de activar el proceso de expulsión o residenciamiento, dicha lectura sería contraria a la tendencia predominante en el constitucionalismo moderno. Un análisis cuidadoso del debate de la sesión de 15 de enero de 1952 no revela una intención clara y contundente de parte de los Delegados. Ese día, en el cual se discutió la Sec. 16, hoy Sec. 20 del Art. III, se suscitó un intercambio entre los Delegados Gutiérrez Franqui y Veray con motivo de una pregunta del último. Procedemos a transcribir lo pertinente:

Sr. VERAY: Aquí, donde dice, "Serán causas de residencia la traición", la palabra ... —página 6, línea 12— la palabra "serán" ¿está usada de modo mandatorio?

Sr. GUTIERREZ FRANQUI: Nosotros entendemos que además de ser descriptivo es mandatorio.

Sr. VERAY: Entonces, en donde dice, "serán causas de resi-

dencia la traición, el soborno, otros delitos graves"; por ejemplo, una infracción al artículo 328 ... que va manejando un legislador, tiene un choque, y como consecuencia de ese choque muere una persona y acusan al legislador del artículo 328, un *felony*, un delito grave, ¿es mandatorio el acusarlo, residenciarlo?

Sr. GUTIERREZ FRANQUI: Compañero ...

Sr. VERAY: En vez de usar la palabra "podrá" ...

Sr. GUTIERREZ FRANQUI: Compañero, este lenguaje no se refiere a los legisladores. Cuando habla de función de legisladores, la palabra que se usa es que "podrá", podrá, por dos terceras partes decretar la expulsión de un legislador por estas mismas causas. Estas son causas de residencia de funcionarios ejecutivos, e incluyen todo delito grave, pero no la mera acusación, sino la convicción de *felony*.

Sr. VERAY: Por eso ... pero por el mero hecho de incurrir en un delito de esa naturaleza que es un delito grave, se le puede procesar porque es mandatorio. Porque si dijera, en vez de "serán", "podrán ser causas", ya entonces es distinto.

Sr. GUTIERREZ FRANQUI: No, compañero, no es mandatorio en el sentido —yo no sé si podría explicar esto claramente— no es mandatorio en el sentido de quitarle la discreción que tiene la Cámara de Representantes para decidir si formula la acusación o no, pero [en] el carácter que tiene de descriptivo, de que siempre tienen la naturaleza de ser causa de residencia, claro, nadie puede obligar a la Cámara de Representantes a formular la acusación, aunque concurran cualquiera de estas circunstancias. No hay medio en ley para obligarla. 3 Diario de Sesiones de la Convención Constituyente 1953 (1961).

Debemos comenzar señalando que el diálogo descrito no giraba en torno a si el residenciamiento requería o no una convicción previa. El asunto objeto de discusión era qué ocurría en casos en que sí hubiera una acusación o convicción previa. ¿Estaba en tal caso la Cámara de Representantes obligada a formular una acusación y comenzar un proceso de residenciamiento? Aun cuando el Delegado Gutiérrez Franqui contesta en la negativa, en el transcurso de su participación parece decir que el proceso requería una convicción. Tal expresión, sin embargo, no es manifestación de una posición firme sobre el asunto y no puede derrotar el texto claro de la Constitución.

Al momento de su redacción, la experiencia dictaba que no existía este tipo de restricción y no hay ninguna expresión en el debate ni en los informes de las comisiones que revele una intención de adoptarlo. De haber los Delegados querido exigir una convicción previa lo hubieran dispuesto expresamente.

De hecho, la evidencia histórica demuestra que los cuerpos parlamentarios pueden ejercer esta facultad sin necesidad de que exista una convicción previa. En general, se parte de la premisa de que en este tipo de procedimiento cada Cámara legislativa debe tener facultad para hacer valer los principios de integridad que suponen la ostentación de un cargo de legislador, aun en casos en que haya sido la decisión de las otras ramas de gobierno no encausar o condenar a la persona. Supeditar la acción parlamentaria a una convicción previa por un tribunal puede también representar un problema de separación de poderes. Esta conclusión conllevaría que el Poder Legislativo, en efecto, tendría que siempre esperar por la decisión del Poder Ejecutivo de encausar una persona y por la adjudicación del Poder Judicial, antes de expulsar a uno de sus miembros por haber incurrido en una conducta que, a juicio de sus pares, configuraba un delito estatuido de naturaleza grave y que afecta el prestigio, la integridad y el orden de los procedimientos del cuerpo parlamentario correspondiente.

Por otro lado, si se le otorgó al Poder Legislativo la facultad de residenciar al Primer Ejecutivo, el Contralor y a los jueces que dirigen el Poder Judicial sin necesidad de una convicción previa, no hay fundamentos para concluir que se pretendió utilizar otros criterios para los legisladores. Así claramente lo entendió el Delegado Luis Negrón López, Presidente de la Comisión de la Rama Legislativa:

> ... Los delitos públicos se castigan poniendo en vigor las sanciones que contiene el Código Penal. Y Su Señoría le ha dado su

voto a favor de una disposición de esta misma proposición sustituta que establece el procedimiento, las mismas causas del *impeachment*, del residenciamiento, para separar a los miembros de la Asamblea Legislativa que cometan soborno, traición, delitos graves y otros delitos menos graves que impliquen depravación moral. Con esa disposición sobre *impeachment*, adoptando para los miembros del poder legislativo lo mismo que la constitución hace en cuanto a los demás poderes del estado, confiriéndole a los cuerpos legislativos el poder de acusar y juzgar los transgresores de la ley que puedan ocupar posiciones de alta jerarquía en la rama legislativa, Su Señoría no debe tener temor alguno .... Diario de Sesiones, *supra*, Vol. 2, pág. 795.

En conclusión, en virtud de lo dispuesto en la Sec. 21 del Art. III de la Constitución del Estado Libre Asociado, *supra*, para el residenciamiento, además del caso de traición y soborno, las causas de expulsión están limitadas a otros delitos graves y aquellos menos graves que impliquen depravación. En ambos casos se refiere a delitos estatuidos y ninguno requiere una convicción previa. Examinemos ahora los límites al proceso de expulsión que la Constitución garantiza en beneficio de los legisladores.

C. Aun cuando hemos reconocido la amplitud del poder parlamentario en casos de expulsión, éste no puede ser ejercido de forma contraria a los requerimientos expresos de la Constitución. Tales limitaciones están contenidas tanto en la Sec. 9 del Art. III de la Constitución del Estado Libre Asociado, *supra*, así como por las garantías mínimas a las que es acreedor un legislador como parte de la protección que le brinda la cláusula del debido proceso de ley. Sec. 7 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1.

Por la naturaleza esencialmente política del proceso, la limitación principal establecida es el requisito del número de votos que se necesitan para la expulsión. Al requerir tres cuartas partes (3/4) del número total de miembros, se garantiza que suficientes legisladores de los partidos de

mayoría y de minoría concurran con la expulsión y se evita que una mayoría abuse de su poder de expulsión.

En cuanto al procedimiento que ha de seguirse, no se trata de un encausamiento criminal, y por su naturaleza, cada Cámara se constituye en acusador, fiscal, juez y Jurado del legislador. Véase *United States v. Brewster*, 408 U.S. 501, 519 (1972) (*dictum*). Sin embargo, aunque el proceso no es judicial, su naturaleza adjudicativa requiere que se provean los elementos esenciales de un debido proceso de ley. Por esta razón, en la mayoría de los estados los procedimientos utilizados al disciplinar o expulsar a un legislador han reconocido las garantías siguientes: notificación de los cargos, oportunidad de ser escuchado y presentar prueba, oportunidad de estar representado por abogado y oportunidad de contrainterrogar a los testigos de cargo. McLaughlin, *supra*, págs. 46–47; Memorando de 14 de febrero de 1986, *Research Department, Minnesota House of Representatives*.

Además de estas garantías de naturaleza constitucional, los propios cuerpos legislativos pueden reglamentar sus procesos disciplinarios y de expulsión con el objetivo de salvaguardar la objetividad y pureza del procedimiento. En el caso del Senado de Puerto Rico, la conducta de los Senadores y los procesos disciplinarios están regulados por un código de ética creado mediante la Resolución Núm. 130 de 18 de marzo de 1993. Además de establecer las normas y los criterios rectores de conducta, el Código dispone los procedimientos que han de seguirse en la investigación de querellas y la presentación de recomendaciones para la imposición de sanciones disciplinarias. A estos fines se delega el manejo de los procedimientos investigativos a una Comisión de Ética, la cual está facultada tanto para recibir querellas, como para iniciar procedimientos *motu proprio*.

En cuanto a la naturaleza de los procesos disciplinarios, el inciso (c) del Art. 9 del Código de Ética, *supra*, enumera

unos derechos que amparan al Senador bajo investigación. El listado incluye: la notificación oportuna de los cargos, conocer toda la prueba que se utilice en su contra, oportunidad de presentar prueba, estar representado por abogado, contrainterrogar testigos en su contra, una adjudicación imparcial, levantar un récord de los procedimientos y que la decisión final se emita con base en los hechos corroborados durante la investigación y esté sustentada en la totalidad del récord.

La Comisión de Ética debe tramitar el proceso de acuerdo con lo pautado por el Art. 14 del Código de Ética, *supra*, y su propio reglamento. En particular, el inciso (c) del Art. 14, *supra*, establece los términos dentro de los cuales la Comisión debe atender las querellas, conceder vistas y resolver finalmente el asunto ante su consideración. En los casos en que la recomendación sea una expulsión, la Sec. (6) dispone:

(6) Si la violación por parte de un Senador es de tal naturaleza que existe base sustancial para instar un proceso de expulsión, la Comisión radicará en la Secretaría del Senado, para la consideración por este Cuerpo, los cargos correspondientes. El Cuerpo actuará de conformidad con lo dispuesto en las Secciones 9 y 21, respectivamente, del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico, en lo concerniente al proceso para decretar la expulsión de los miembros del Senado, así como de cualquier otra disposición de ley o reglamento aplicable. Art. 14(c)(6) del Código de Ética, *supra*, págs. 164–165.

Por último, el Art. 17 del Código de Ética, *supra*, reconoce claramente la necesidad de salvaguardar las garantías constitucionales:

En la interpretación y aplicación de las normas contenidas en este Código de Ética se garantizan los derechos enumerados en la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico y la Constitución de los Estados Unidos de América. Art. 17 del Código de Ética, *supra*, pág. 168.

Todo Senador objeto de una investigación está protegido por los límites procesales indicados. Se ha recalcado la importancia de que estos derechos se reconozcan durante el proceso de investigación que realice la comisión cameral correspondiente, momento en que su efectividad puede ser mayor. Esto es así, debido a que podría resultar impráctico, por ejemplo, conceder el derecho a contrainterrogar testigos durante la propia sesión cameral en que se discuta la expulsión. McLaughlin, *supra.*

Una vez delimitada la normativa aplicable en términos de las causas de expulsión y las garantías que debe proteger el cuerpo legislativo, veamos si la expulsión del Senador Nogueras Cartagena cumplió con las exigencias de nuestro ordenamiento constitucional.

## IV .

La validez de la expulsión de Nogueras Cartagena depende de que la acción parlamentaria se haya fundamentado en las causas de residenciamiento dispuestas en la Sec. 21 del Art. III de la Constitución del Estado Libre Asociado, *supra*, y que durante el proceso haya gozado de las garantías del debido proceso de ley.

A.   Nogueras Cartagena sostiene que la Constitución requiere una convicción previa por un delito grave antes de que una cámara legislativa pueda expulsar a uno de sus miembros. Los demandados, por su parte, alegan que tal requisito no existe y que el Senador fue expulsado de acuerdo con las causas contenidas en la Constitución.

En su Informe Final, la Comisión de Ética del Senado presentó cuatro (4) cargos por violaciones: a la Ley de Ética Gubernamental, a la Ley Habilitadora de la Reforma Contributiva de 1994, a la Ley Núm. 13, *supra*, y al Código de Ética del Senado. De inicio, declinamos considerar los últimos dos (2) cargos como causas de la expulsión. Esto es debido a que ni la infracción al Código de Ética del Senado

ni la violación a la ley de salarios de legisladores (Ley Núm. 13, *supra*) son constitutivas de delito, sea grave o menos grave. No pueden ser causa, por lo tanto, a la luz de la Sec. 21 del Art. III de la Constitución del Estado Libre Asociado, *supra*.

En el caso de los restantes dos (2) cargos, ambos sí constituían delitos estatuidos. Sin embargo, de acuerdo con las recomendaciones del Informe de la Comisión de Ética, las violaciones a la Ley de Ética Gubernamental constituían "razones suficientes en derecho para recomendar la expulsión del Senador". (Informe Final de la Comisión de Ética, pág. 22) *Exhibit*, pág. 26. *Este es, pues, el delito al que limitaremos nuestro análisis.*

La naturaleza de las imputaciones iban dirigidas hacia el incumplimiento del Senador con la obligación de entregar anualmente sus informes financieros a la Oficina de Ética Gubernamental. Los Arts. 4.1 y 4.2 de la Ley de Ética Gubernamental, 3 L.P.R.A. secs. 1831–1832, imponen a determinados funcionarios y empleados públicos la obligación de rendir informes financieros en la Oficina de Ética Gubernamental. Mientras el funcionario permanezca en el cargo, deberá someter estos informes todos los años no más tarde de 1ro de mayo.

Entre los funcionarios compelidos a cumplir con la entrega de informes, la ley incluye de forma expresa a los legisladores, sujeto el caso de éstos a lo dispuesto en el Art. 4.10(d), 3 L.P.R.A. sec. 1840(d). Art. 4.1(a)(6), 3 L.P.R.A. sec. 1831(a)(6). Según dispone el Art. 4.10(d), *supra*, en caso de que el Director de la Oficina de Ética Gubernamental identifique la posible violación de las disposiciones de la ley por parte de un legislador, está en la obligación de remitir el informe financiero a la Cámara correspondiente para que se tomen las acciones que correspondan.

Esta regla debe verse en conjunción con los Arts. 2.4(j) y 3.5 (3 L.P.R.A. secs. 1814(j) y 1825). El Art. 2.4(j), *supra*, dispone que las cámaras legislativas aprueben reglamen-

tos para atender lo relacionado a la obligación de rendir los informes financieros. Mientras, el Art. 3.5, *supra*, en lo que concierne a los legisladores, dispone que la conducta de éstos se rige por las disposiciones de ley aplicables y la reglamentación que adopten. Igualmente, se instruye a la Rama Legislativa a adoptar Códigos de Ética o enmiendas a la reglamentación en vigor, que incorporen los principios enunciados en el Código de Ética que la ley adopta para los funcionarios del Ejecutivo. Véanse los Arts. 3.1–3.8 (3 L.P.R.A. secs. 1821–1828). En virtud de estas disposiciones, el Senado de Puerto Rico adoptó su Código de Ética y el Reglamento sobre Radicación de Informes Financieros para los Senadores, Funcionarios y Empleados del Senado de Puerto Rico. Resoluciones del Senado Núms. 130 y 131 aprobadas el 18 de marzo de 1993.

Por último, la Ley de Ética Gubernamental es clara en establecer un deber ministerial de presentar los informes. Su Art. 4.11(a)(1), 3 L.P.R.A. sec. 1841(a)(1), dispone que el incumplimiento con este deber *es constitutivo de delito grave*, con lo cual se sientan las bases para utilizar la comisión de dicho delito como causa de expulsión.

El Senado de Puerto Rico concluyó que Nogueras Cartagena incurrió en el tipo de conducta delictiva grave que ofende la función pública e implica la carencia del mínimo de integridad y juicio para desempeñar sus funciones como legislador. Cuando la Asamblea Legislativa creó la obligación de presentar los informes financieros y sancionó penalmente su incumplimiento, dejó claro su sentir respecto a las exigencias que imponen las responsabilidades éticas y morales sobre los servidores públicos. Según se expuso en la Exposición de Motivos de la Ley Núm. 12, *supra*, 1985 Leyes de Puerto Rico 709:

> En todo momento, tiene el Estado que garantizar el respeto al derecho y la obediencia a la ley. Esta misión le es fundamental especialmente cuando se trata de la conducta de aquellos funcionarios públicos que lo representan como servidores.

Para restaurar la confianza del pueblo en su Gobierno y en sus funcionarios públicos, cuando muchos de ellos han rebasado el nivel de lo tolerable, es preciso adoptar nuevas medidas legislativas que sean eficaces para prevenir y para penalizar el comportamiento delictivo de aquellos funcionarios que, en el desempeño de sus labores gubernamentales, vulneren los principios básicos de una ética de excelencia.

Por otro lado, tomamos conocimiento judicial de las controversias suscitadas en los pasados años en relación con el alegado incumplimiento de los legisladores con las exigencias de la Ley de Ética Gubernamental, en particular, la surgida con los informes del Senador Nogueras Cartagena. *El Vocero de P.R. v. Hernández Agosto*, 133 D.P.R. 413 (1993); *El Vocero de P.R. v. Nogueras I*, 138 D.P.R. 103 (1995); *El Vocero de P.R. v. Nogueras II*, 138 D.P.R. 642 (1995). En nuestra opinión *Per Curiam* de 14 de junio de 1995 dimos vigencia al mandato legislativo y expresamos que: "Rendir los informes financieros requeridos por este ordenamiento constituye claramente una obligación legal que surge del cargo público y no admite discreción en su ejecución. Su incumplimiento constituye un delito grave que, de probarse, impide que un miembro de la Asamblea Legislativa pueda postularse nuevamente." *El Vocero de P.R. v. Nogueras II*, supra, pág. 647. Valga señalar que en esa opinión, si bien expresamos que en aquel momento ya Nogueras Cartagena había cumplido con su deber ministerial, no fue nuestra intención pasar juicio respecto a si su conducta era o no castigable. Es de suponer que la necesidad de utilizar el mecanismo del *mandamus* fue resultado del *incumplimiento* del Senador con un deber impuesto por ley. En ese sentido, la controversia judicial que debíamos resolver terminaba con la presentación por parte de Nogueras Cartagena de sus informes financieros, ya fuera esto realizado tardíamente y pasando por alto de forma abusiva todas la prórrogas concedidas por la Oficina de Ética Gubernamental. Juzgar si esta conducta podía originar un proceso disciplinario o de expulsión, era una deter-

minación del Senado. De otro lado, la decisión de encausar criminalmente al Senador Nogueras Cartagena correspondía al Poder Ejecutivo.

En su análisis sobre el alegado incumplimiento del Senador Nogueras Cartagena con la Ley Núm. 13, *supra*, la Comisión de Ética examinó otros documentos relacionados a los informes financieros del Señador. En particular, la Comisión señaló que al evaluar el informe financiero y la declaración jurada que debe presentarse en la Oficina de Ética Gubernamental, se encontraron unas contradicciones. A base del examen de los informes financieros presentados en dicha Oficina, la Comisión concluyó lo siguiente:

1) El Senador Nogueras radicó sus informes financieros en la Oficina de Etica Gubernamental tardíamente. El informe correspondiente al 1992 lo radicó el 15 de septiembre de 1993. El informe de 1993 lo presentó el 27 de febrero de 1995 y el de 1994, el 21 de junio de 1995.
2) El Senador se excedió sin justa causa de las prórrogas concedidas por el Director de la Oficina de Etica Gubernamental. *Exhibit*, pág. 15.

En este caso no se trata, sin embargo, de la comisión de un delito grave de mera negligencia. Cuando el Senado determinó que el incumplimiento con la obligación de rendir los informes a la Oficina de Ética Gubernamental constituyó el tipo de delito grave que justificaba una expulsión, descansó en que la conducta de Nogueras Cartagena era indicativa de intención y voluntariedad. La Comisión de Ética determinó que el Senador incurrió en el delito de forma intencional y mostrando un menosprecio hacia la función pública. En su informe, después de hacer un recuento del incumplimiento del Senador con la Ley de Ética Gubernamental, se expresó lo siguiente:

De lo anterior se desprende un claro patrón de conducta que prueba la intención del Senador de incumplir con su obligación.

Finalmente podemos determinar por todo lo anterior que el Senador conocía de su deber, y voluntariamente y a sabiendas

incumplió con éste. Como el Tribunal ha expresado *la volunta-
riedad, sólo requiere prueba de que se dejó de radicar intencio-
nalmente y no debido a un accidente, error o causa inocente.
Pueblo v. Adorno 99 DPR 555 81971.* [sic] (énfasis suplido)
El Senador violó la Ley Núm. 12 de junio de 1985 al no radi-
car sus informes financieros conforme a la ley, actuando a sa-
biendas y voluntariamente y debe estar sujeto a las medidas
que la Comisión estime pertinente. Apéndice, pág. 291.

Una vez se llegó a dicha determinación, existía una
causa de expulsión, y era potestad del Senado en pleno
ejercer o no la prerrogativa contenida en la Sec. 9 de la
Constitución del Estado Libre Asociado, *supra*. En conclu-
sión, la actuación parlamentaria de amparar su decisión de
expulsión en la comisión del delito grave dispuesto en la
Ley de Ética Gubernamental, se ajustó a los preceptos con-
tenidos en las Secs. 9 y 21 del Art. III de la Constitución
del Estado Libre Asociado, *supra*. Esto, a su vez, sirve de
base para la investigación emprendida por la Comisión de
Ética del Senado.

En cuanto a la alegación de Nogueras Cartagena de que
su expulsión no fue válida porque la Constitución requiere
la existencia de una convicción previa, como ya señaláramos
en la Parte III, tal argumento no haya resguardo en el
texto constitucional. El alegado impedimento era inexis-
tente, por lo que el planteamiento resulta inmeritorio.

B. El ejercicio del poder de expulsión se encontraba,
además, limitado por otras garantías dispuestas en la
Constitución. Nogueras Cartagena alega que su derecho a
un debido proceso de ley no fue respetado, por lo que pro-
cede pasar juicio sobre tal planteamiento.

Hemos examinado con cuidado todo el proceso que cul-
minó en la expulsión de Nogueras Cartagena. De la rela-
ción de hechos expuesta se desprende que el Senador fue
notificado del cargo en su contra por violaciones a la Ley de
Ética Gubernamental. Durante el proceso, la Comisión de
Ética le brindó una amplia oportunidad de defenderse y de
presentar prueba a su favor. La Comisión celebró unas vis-

tas en las que Nogueras Cartagena fue escuchado. Además, siempre se le garantizó el derecho a la asistencia de abogado. Los hechos, según surgen de la totalidad del expediente, son indicativos de que Nogueras Cartagena gozó de las garantías procesales mínimas que ofrece nuestro ordenamiento constitucional. Además, la Comisión de Ética le advirtió respecto a los derechos que le cobijaban de acuerdo con el Código de Ética.

El día en que fue considerada su expulsión por el Pleno del Senado, los procedimientos se condujeron en orden. La Comisión, a través de su Presidente, pudo presentar y explicar su Informe, al mismo tiempo que Nogueras Cartagena tuvo la oportunidad de defenderse. Al 25 de abril de 1996, Nogueras Cartagena había tenido la oportunidad previa de prepararse para los procesos. La denegación a la posposición de la sesión, solicitada por la representación legal del Senador y avalada por éste, estaba dentro de la sana discreción del cuerpo legislativo.

Por último, en cuanto al mínimo de votos requeridos, el Senado de Puerto Rico estaba compuesto en ese entonces de veintinueve (29) miembros. La Sec. 9 de la Constitución del Estado Libre Asociado, *supra,* requiere el voto afirmativo de al menos tres cuartas partes (3/4) para decretar la expulsión. El resultado de la votación para la expulsión del Senador Nogueras Cartagena fue veintitrés (23) votos a favor y seis (6) en contra, por lo que se cumplió con el mínimo requerido por la Constitución. Debemos concluir que Nogueras Cartagena disfrutó de todas las garantías que legítimamente le cobijaban como miembro del Senado y representante ante la Asamblea Legislativa, electo por el Pueblo de Puerto Rico.

En conclusión, el Senado de Puerto Rico actuó dentro de los límites legales y constitucionales al investigar la conducta del Senador Nogueras Cartagena con relación a la presentación de los informes financieros requeridos por la Ley de Ética Gubernamental, determinar la comisión de

un delito grave constitutivo de causa de expulsión y expulsarlo del Senado por una mayoría de tres cuartas partes (3/4) del cuerpo legislativo.

Por las razones expuestas anteriormente, estamos conformes con la sentencia emitida por este Tribunal que deniega el auto de *mandamus* presentado por el ex Senador Nicolás Nogueras Cartagena que impugnaba su expulsión.

— O —

Opinión concurrente y disidente del Juez Asociado Señor Negrón García.

## I

Bajo el ideal de un sistema democrático de gobierno, plasmado en nuestra Constitución, el legislador puertorriqueño es heredero de una hermosa tradición histórica, ganada con el esfuerzo, el trabajo y la honestidad de generaciones de servidores públicos.

Por tal razón, "[e]s vergonzoso cuando un legislador actúa contrario a la ética". (Traducción nuestra.) T. More Kellenberg, *When Lawyers Become Legislators: An Essay and a Proposal*, 76 Marq. L. Rev. 343 (1993). *El desprestigio social y resquebrajamiento en la confianza ciudadana en sus instituciones públicas —tristemente plasmado en un refrán de cuño pueblerino "el que hizo la ley, hizo la trampa"— es aún mayor cuando ese legislador incurre en actos tipificados como delitos graves, y con su actuación atenta contra un deber primario impuesto a todos: dejar de rendir sus planillas de contribución sobre ingresos de modo consistente e injustificado, acto punible para cualquier ciudadano común y constitutivo de depravación moral, cuando su autor es hacedor de leyes.* "El legislador no puede —racionalmente— colocarse en el supuesto de que el orden normativo que establece o contribuye a organizar llegue a

ser apto para otorgar facultades cuyo ejercicio llegue a contrariar el orden moral ...." C. Mouchet, *Los conflictos entre la Moral y el Derecho*, XX Rev. Jur. U.P.R. 1, 7–8 (1950).

Al amparo del Art. III, Sec. 9 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1,(¹) los miembros del Senado y de la Cámara de Representantes *"son responsables por el buen nombre y la reputación de la Cámara. De su conducta depende el juicio que el pueblo se forme sobre la Legislatura. Una legislatura debe actuar con rapidez y firmeza tan pronto tenga pruebas ciertas de que un miembro ha violado ese deber"*. (Énfasis suplido y escolio omitido.) *La Nueva Constitución*, Río Piedras, Ed. U.P.R., 1954, pág. 379.

Sobre este particular, varios principios sostienen nuestro delicado esquema constitucional de un balance de poderes. *Primero*, la Legislatura es el *único juez* de la disciplina de sus miembros. *Segundo*, nuestra Constitución *le reconoce a cada Cámara la facultad de expulsar a sus miembros* y exige para ello la anuencia de tres cuartas (3/4) partes de la totalidad de sus miembros. *Tercero*, las *únicas* causas de expulsión son traición, soborno, delitos graves y aquellos delitos menos grave que impliquen depravación. *Cuarto, esa actuación legislativa merece gran deferencia por parte de los tribunales. Quinto*, la *intervención judicial es limitadísima.* No es un *juicio de novo.* En casos apropiados, esta función *se circunscribe a interpretar la Constitución*(²) *y a examinar si, en el proceso de expul-*

---

(¹) Dispone:

"Cada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección; elegirá sus funcionarios, *adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno; y con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencia en la sección 21 de este Artículo.* Cada cámara elegirá un presidente de entre sus miembros respectivos." (Énfasis suplido.) Art. III, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 340.

(²) *"Sin duda la controversia es justiciable.* Basta recordar que la Sec. 9 del Art. III de la Constitución, *supra*, que dispone que las cámaras legislativas serán los únicos jueces de la capacidad legal de sus miembros y el poder de expulsión, no

*sión, se cumplió con las formalidades constitucionales y se observaron los requisitos mínimos del debido proceso de ley.*([³]) *Sexto*, validado ese escenario de legalidad, aun cuando discrepemos, *no corresponde a los tribunales, sustituir los criterios ni la medida disciplinaria adoptada por los legisladores.*

## II

Expongamos sucintamente la génesis de este caso. El Lcdo. Nicolás Nogueras Cartagena resultó electo Senador por acumulación por el Partido Nuevo Progresista en las elecciones generales celebradas el 3 de noviembre de 1992. Juró y tomó posesión del cargo el 2 de enero de 1993. Dicho cuerpo legislativo quedó *originalmente* integrado por veintinueve (29) miembros.([⁴])

---

margina ni priva a este Tribunal de ejercer su jurisdicción como intérprete final de la Constitución. *Definir sus contornos, entre ellos*, los requisitos de sus miembros, los derechos de las minorías *y las facultades del Poder Legislativo, es prerrogativa exclusiva nuestra*. Como resolvimos en *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750, 758 (1977), no estamos ante un 'postulado del derecho natural, ... la concesión irrestricta de tan vasto poder a un parlamento está preñada de peligros para las minorías, la regla del imperio de la ley y la salud de la democracia'." (Énfasis en el original suprimido y énfasis suplido.) *P.P.D. v. Peña Clos I*, 140 D.P.R. 779, 844 (1996), opinión disidente.

([³]) El Art. II, Sec. 7 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 275, dispone:

"Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. ... Ninguna persona será privada de su libertad o propiedad *sin debido proceso de ley* ...." (Énfasis suplido.)

([⁴]) En esas elecciones, el P.N.P. obtuvo veinte (20) escaños, el Partido Popular Democrático (P.P.D.) ocho (8) y el Partido Independentista Puertorriqueño (P.I.P.), uno (1).

Esta composición numérica e ideológica quedó *alterada* con la desafiliación del Senador Sergio Peña Clos del P.P.D. y su eventual ingreso al P.N.P.

La *sentencia* aludida en *P.P.D. v. Peña Clos I*, supra, una mayoría de este Tribunal, por fíat judicial, *inconstitucionalmente* —a nuestro juicio— concluyó que el P.P.D. era acreedor de un Senador adicional. Como resultado de esto, el P.N.P. tiene ahora la *ventaja* de veintiún (21) senadores, el P.P.D. el número *original* de ocho (8) y el P.I.P. uno (1).

Al disentir, expusimos que el P.N.P. había *aumentado* por uno (1) su delegación y que esa "nueva composición ideológica acentuó la mayoría absoluta de dos terceras partes (2/3) que tenía el P.N.P. y el extraordinario poder para, sin necesidad de contar con el voto de las minorías, sancionar o expulsar a uno de sus miembros al amparo de la Sec. 9, Art. III de nuestra Constitución, *supra*. Esta ventaja subsiste,

Luego de varios trámites, el 25 de abril de 1996 el Senado —constituido en sesión plenaria— acogió el Informe de su Comisión de Ética. Mediante votación de veintitrés (23) votos a favor y seis (6) en contra, decretó la expulsión del Senador Nogueras Cartagena por varias causas, a saber, quebrantar el Código de Ética, la ley de salarios de los legisladores —Ley Núm. 13 de 24 de junio de 1989 (3 L.P.R.A. secs. 2, 34, 577 y 577 n.; 2 L.P.R.A. secs. 28, 28 n. y 75 n.)— y, *especialmente, haber incurrido en dos (2) delitos graves al violar la Ley Gubernamental sobre Informes Financieros y la Ley Habilitadora de la Reforma Contributiva de 1994 (no rendir sus Planillas correspondientes a los años 1991, 1992 y 1993).*

El 1ro de mayo, el licenciado Nogueras Cartagena nos solicitó que, mediante *mandamus*, ordenásemos su reinstalación argumentando que el Senado actuó inconstitucionalmente. *Desde el 23 de mayo votamos que no procedía.* Exponemos ahora, en detalle y separadamente, los fundamentos que animaron nuestra conciencia judicial.

---

no obstante la vacante creada con la expulsión del Lcdo. Nicolás Nogueras decretada el pasado 25 de abril.

"De igual modo aumenta el presupuesto del Senado y, como corolario, automáticamente también el asignado al P.N.P., con las consabidas oportunidades y ventajas sobre el área de recursos humanos y al cubrir las comisiones senatoriales. En contraste con ello, la representación de la minoría P.P.D. y su presupuesto se mantienen *igual. ¿Es esto un balance constitucional ... justo?* Más aún, en comparación con el *nuevo total de senadores,* incrementa la representación *porcentual* de la mayoría del P.N.P. y disminuye la de la minoría del P.P.D., ello en claro menosprecio del deseo electoral y el espíritu de la Constitución". (Énfasis en el original y escolio omitido.) *P.P.D. v. Peña Clos I,* supra, pág. 854.

Finalizamos así: "Mediante sus propios actos —desafiliación del P.P.D. y posterior ingreso al P.N.P., partido de oposición mayoritario— el licenciado Peña Clos *quebrantó la voluntad electoral, la cohesión ideológica con sus compañeros de minoría y el compromiso de representar la filosofía política y el programa del partido bajo cuya insignia fue electo.*

*"Su desafiliación e ingreso al P.N.P. es una anomalía que no puede elevarse a categoría de virtud.* Por imperativo constitucional *constituyó una renuncia* que creó una *vacante* perteneciente al P.P.D. No hay razón alguna jurídica ni moral para *judicialmente* crear inconstitucionalmente otro *escaño más* y permitirle continuar como Senador del P.N.P. *Nadie, ni un solo elector, lo eligió para ocupar un escaño de ese partido.*" (Énfasis en el original.) *P.P.D. v. Peña Clos I,* supra, pág. 859.

# III

En cuanto al poder de expulsión, de la misma manera que adoptaron otras instituciones, las colonias norteamericanas asumieron la visión del Parlamento inglés([5]) y, después, los Padres de la Constitución federal lo concedieron al Congreso. Si bien no impusieron restricciones substantivas, requirieron dos terceras (2/3) partes de sus miembros como protección contra el ejercicio crudo del control faccionario. D.D. Ellis, *Powell v. McCormick and the Power to Expel: Some Unanswered Questions Regarding the Framers' Intent*, 5 Ga. L. Rev. 203, 237–245 (1971). Nada sugiere en sus debates que se quiso limitar la discreción del Congreso para definir la conducta que justificaría una expulsión; sólo lo que la mayoría sustancial aludida estimara *conducta impropia (disorderly behavior)*.([6])

Nuestra Asamblea Constituyente, aunque siguió el modelo, *no calcó la Constitución federal y proveyó más garantías*. A. Fernós-Isern, *Notes and Comments on the*

---

([5]) El origen histórico del poder parlamentario para disciplinar a sus miembros se remonta al año 1553, cuando la Cámara de los Comunes inglesa, por vez primera, adjudicó unas elecciones y expulsó a un diputado. F.W. Maitland, *The Constitutional History of England*, Cambridge, University Press, 1963, págs. 247–248. Desde entonces, dicho organismo se arrogó el derecho exclusivo de controlar sus propios procedimientos, incluso disciplinar sus miembros. D. Bowman y J.F. Bowman, *Article I, Section 5: Congress' Power to Expel—An Exercise in Self-Restraint*, 29 Syracuse L. Rev. 1071, 1073 (1978). En esa época no había estatuto que limitara ese poder ni se reconocía restricción substantiva de ninguna clase. Determinar qué conducta amenazaba la integridad del Cuerpo o a su adecuado funcionamiento —y justificaba la remoción— era concebido como una *facultad inherente y absoluta*. Bowman y Bowman, *supra*, pág. 1083.

([6]) La Constitución de Estados Unidos, en su Art. I, Sec. 5, dispone:

"Each House may determine the Rules of its Proceedings, punish its Members for *disorderly Behaviour*, and, with the Concurrence of two thirds, expel a Member."

Antes de adoptarse la versión final de esta sección, no se requería la concurrencia de dos terceras (2/3) partes de los miembros. Fue el Delegado James Madison quien propuso dicho requisito, pues a su entender "la facultad de expulsar [era] demasiado importante como para ser ejercitada por una escasa mayoría de los miembros; pues en situaciones de emergencia podía ser utilizada peligrosamente". (Traducción nuestra.) C. Warren, *The Making of the Constitution*, Boston, Ed. Little, Brown and Co., 1937, pág. 462.

*Constitution of the Commonwealth of Puerto Rico*, Washington, D.C., [s. i.], 1952, págs. 39–40. Conscientes también de que un partido político mayoritario podría abusar, y para salvaguardar las minorías, fijó el requisito aludido de tres cuartas (3/4) partes de sus miembros. 2 Diario de Sesiones de la Convención Constituyente 815 (1952). Como *protección adicional*, estableció que el poder de expulsión sólo podía ejercitarse por las causas expresamente enumeradas en la Sec. 21 del Art. III, Const. E.L.A., L.P.R.A., Tomo 1, a saber, *"la traición, el soborno, otros delitos graves, y aquellos delitos menos graves que impliquen depravación"*. (Énfasis suplido.)

Aunque el texto constitucional del Art. III, Sec. 9, L.P.R.A., Tomo 1, es *parco*, el ejercicio y los límites de esta facultad legislativa de expulsar se entiende mejor en relación con la prerrogativa de los *procesos de residenciamiento*,([7]) que también tiene, con *carácter exclusivo*, la Asamblea Legislativa bajo el mencionado Art. III, Sec. 21 de la Constitución.([8]) Veamos.

---

([7]) A veces llamado *juicio político*, esto es, el "procedimiento para exigir responsabilidad a determinados funcionarios públicos". M. Ossorio, *Diccionario de ciencias jurídicas, políticas y sociales*, Buenos Aires, Ed. Heliasta S.R.L., 1984, pág. 405.

([8]) Dispone:

"La Cámara de Representantes tendrá el poder exclusivo de iniciar procesos de residencia y con la concurrencia de dos terceras partes del número total de sus miembros formular acusación. El Senado tendrá el poder exclusivo de juzgar y dictar sentencia en todo proceso de residencia; y al reunirse para tal fin los Senadores actuarán a nombre del pueblo y lo harán bajo juramento o afirmación. No se pronunciará fallo condenatorio en un juicio de residencia sin la concurrencia de tres cuartas partes del número total de los miembros que componen el Senado, y la sentencia se limitará a la separación del cargo. La persona residenciada quedará expuesta y sujeta a acusación, juicio, sentencia y castigo conforme a la ley. Serán causas de residencia la traición, el soborno, otros delitos graves, y aquellos delitos menos grave que impliquen depravación. El Juez Presidente del Tribunal Supremo presidirá todo juicio de residencia del Gobernador.

"Las cámaras legislativas podrán ventilar procesos de residencia en sus sesiones ordinarias o extraordinarias. Los presidentes de las cámaras a solicitud por escrito de dos terceras partes del número total de los miembros que componen la Cámara de Representantes, deberán convocarlas para entender en tales procesos." Art. II, Sec. 21, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, págs. 346–347.

## IV

La Cámara de Representantes *discrecionalmente* ostenta el *poder único de iniciar el proceso de residenciamiento mediante acusación* si concurren dos terceras (2/3) partes del número total de sus miembros. El Senado *exclusivamente juzga* y dicta sentencia *limitada a la separación del cargo*, con el voto de por lo menos tres cuartas (3/4) partes del total de sus miembros. Podrá hacerlo en sesiones ordinarias y extraordinarias. Si se trata del residenciamiento contra el Gobernador, lo presidirá el Juez Presidente de este Tribunal Supremo.[9]

La propia Constitución pauta un procedimiento cuasijudicial, sui géneris. Su validez dependerá de su fiel cumplimiento. *Diversas razones abonan a la conclusión de que no equivale a un juicio criminal análogo ante los tribunales de justicia. Primero, discrecionalmente* la acusación la formula la Cámara de Representantes, *no el Ministerio Público. Nadie puede compeler a la Cámara a acusar.* "No hay medio en ley para obligarla." Diario de Sesiones, *supra*, pág. 1953. *Segundo*, el funcionario es juzgado y sentenciado por los *miembros del Senado. Tercero*, la sentencia consistirá *únicamente* en la separación del cargo. *Cuarto*, procederá sólo por traición, soborno, delitos graves y aquellos *menos graves que impliquen depravación. Quinto*, el residenciado *queda expuesto* a ser procesado criminalmente ante los tribunales.

La Constitución enumera los funcionarios de la más alta jerarquía, sujetos a que sean residenciados, a saber, el Gobernador, los Jueces de este Tribunal Supremo y el Contralor. En cuanto a estos funcionarios, el lenguaje cons-

---

[9] Sobre la visión de los redactores de la Constitución federal y un análisis acucioso de los procesos de residenciamiento del Juez Samuel Chase, del Presidente Andrew Johnson y el trámite y acusación relativo al Presidente Richard Nixon, véanse: J.R. Labovitz, *Presidential Impeachment*, Londres, Yale University Press, 1978; P.S. Fenton, *The Scope of the Impeachment Power*, 65 (Núm. 5) Nw. U. L. Rev. 719 (1970).

titucional *es expreso, claro e idéntico*: podrán ser destituidos sólo *por las causas y mediante el procedimiento* establecido en la Sec. 21 del Art. III de la Constitución, *supra*.

Sin embargo, *distinto de ese mandato* ("mediante el procedimiento"), nuestros Constituyentes, *aunque consignaron iguales causas para la separación de los legisladores*, no mandaron qué debía hacerse a través del proceso de residencia pautado en el referido Art. III, Sec. 21. En lo pertinente, sólo dispusieron que cada Cámara *adoptaría sus reglas para sus procedimientos y gobierno interno, "y con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencia en la sección 21 de este Artículo"*.([10])

Se colige, pues, que para el Senado o la Cámara de Representantes expulsar a uno (1) de sus miembros, *tiene que ceñirse a esas mismas causas*. Además, *no es menester una convicción judicial previa*. El texto constitucional del Art. III, Sec. 21 de la Constitución del Estado Libre Asociado *supra*, pág. 347, estipula que el Gobernador, Juez del Tribunal Supremo o Contralor residenciado "quedará expuest[o] y sujet[o] a acusación, juicio, sentencia y castigo conforme a la ley". Este lenguaje implica que el funcionario residenciado puede ser *luego sometido a un procedimiento criminal*. No es un imperativo acusar, ni previa ni poste-

---

([10]) Se trata de una *facultad de carácter inherente, análoga* a la que tradicionalmente hemos reclamado, para reglamentar la admisión y remoción del ejercicio de la abogacía. Incluye investigar y tomar las determinaciones correspondientes sobre la conducta de los miembros de nuestra profesión e incluso decretar su expulsión, es, la separación permanente o indefinida. *In re Córdova González*, 135 D.P.R. 260 (1994); *In re Belén Trujillo*, 128 D.P.R. 949 (1991); *García O'Neill v. Cruz*, 126 D.P.R. 518 (1990); *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778 (1984); *In re Rojas Lugo*, 114 D.P.R. 687 (1983); *In re Roldán González*, 113 D.P.R. 238 (1982); *In re Ríos*, 112 D.P.R. 353 (1982); *In re Rodríguez Torres*, 106 D.P.R. 698 (1978). Véanse, además: L.M. Negrón Portillo, *Ética Profesional*, [s. l.], [s. ed.], 1993; M. Serapión Planas, *Análisis de la responsabilidad profesional del abogado puertorriqueño en las últimas dos décadas*, 50 Rev. Jur. U.P.R. 285, 286 (1981); J.B. Fuster, *La misión del abogado en el mundo contemporáneo y sus implicaciones para las escuelas de Derecho, el Tribunal Supremo y el Colegio de Abogados*, 36 Rev. Jur. U.P.R. 579, 627 y 639 (1967).

riormente, pero si se hace, el proceso y la convicción judicial penal puede comenzar y recaer con *posterioridad* al juicio de residencia. Forzoso es concluir que *no es necesaria una convicción previa* para que la Cámara de Representantes pueda *iniciar* un juicio de residencia.

Igual resultado se impone para una cámara legislativa comenzar y efectuar un proceso de expulsión contra uno de sus *miembros*. Requerir la convicción previa de delito equivaldría a trasladar al Poder Judicial lo que la Constitución delegó exclusivamente en la Asamblea Legislativa. Implicaría que no podría ejercitarlo hasta que un tribunal de justicia, luego de las consabidas demoras de un juicio en el tribunal de instancia y tras una apelación, adjudicara con carácter *firme* la culpabilidad del legislador.

El Profesor L. Tribe, al analizar el procedimiento federal de residenciamiento, de contornos parecidos, nos dice que "fue diseñado para que quedara claro que un enjuiciamiento criminal posterior a la separación del cargo no constituye la 'doble exposición' expresamente prohibida por la Quinta Enmienda". (Traducción nuestra.) L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 296. Véase A. Broderick, *What are Impeachable Offenses?*, A.B.A., J. April (1974), pág. 445.

Por último, también observamos que la conducta susceptible de dar margen a un residenciamiento no está necesariamente limitada a que haya sido cometida en la capacidad oficial del legislador. Tampoco estará restringida a la incurrida durante el período del cargo si la misma no era públicamente conocida. Bowman y Bowman, *supra*.

## V

*En lo sustantivo*, surge, además, que en su dinámica operacional, la Constitución parte de la premisa de que las *causas* o la conducta (acción u omisión) por la cual puede

residenciarse a un legislador son *las individuales* —en contraste con la inmunidad que institucionalmente tiene por sus actos legítimos legislativos—([11]) y han de estar tipificadas *previamente* como "la traición, el soborno, otros *delitos graves, y aquellos delitos menos graves que impliquen* depravación". (Énfasis suplido.) Art. III, Sec. 21, Const. E.L.A., *supra*, pág. 347.

Gramaticalmente, esta oración del texto constitucional es *simple*, es decir, *con una sola estructura de sujeto-predicado*. Si la colocamos en el orden correcto, debe decir: "La traición, el soborno, otros delitos graves y aquellos delitos menos grave que impliquen depravación, serán causas de residenciamiento." Mediante este orden oracional ponemos los componentes de la oración en su justa perspectiva: la traición (delito grave), el soborno (delito grave), *otros* delitos graves.([12])

De ordinario, las cosas relacionadas por "otro" *son de la misma naturaleza*, y la relación de diversidad queda establecida con sólo "otro" y el nombre correspondiente. Nuestra casuística ha dicho que desempeña "igual función", *Ramos v. Secretario del Tesoro*, 76 D.P.R. 892, 902 (1954); que "la Legislatura quiso *incluir todo*", *Junta Rel. Trabajo v. Junta del Muelle*, 71 D.P.R. 154, 160 (1950). En el lenguaje constitucional ante nos, "otros" se refiere a "otros *delitos* graves". Se emplea para aplicar algo dicho a uno o algunas más de ciertas cosas mencionadas: "la traición, el soborno, *otros* delitos graves ...." Art. III, Sec. 21, Const. E.L.A., *supra*, pág. 347.

También notamos la "y", *conjunción coordinante y copulativa*,([13]) cuyo oficio es unir, añadiendo (Ej: Esto *y* aquello),

---

([11]) R. Berger, *Impeachment: The Constitutional Problems*, Massachusetts, Harvard University Press, 1973, págs. 214–223.

([12]) Véanse: N. Mínguez Fontán, *Gramática estructural del español*, Madrid, Eds. Partenón, 1978, pág. 199; M. Moliner, *Diccionario de Uso del Español*, Madrid, Ed. Gredos, 1977.

([13]) La *conjunción*, en términos generales, es una palabra invariable cuya función es unir palabras y preposiciones. Al unir dos (2) elementos, puede suceder que

otros delitos menos graves *que* impliquen depravación moral, serán (los delitos) causas de residenciamiento.

*Disentimos de todo intento de limitar sustancialmente la facultad constitucional de las cámaras legislativas bajo el predicado de que la Constitución visualiza, entre las causas de expulsión, sólo aquellos delitos graves cuya naturaleza sea igual a la traición o el soborno, esto es, que "atenten contra la función pública o a la confianza ciudadana".* No es necesaria mucha elucidación para comprender que, históricamente, los delitos de traición y soborno siempre se consideraron deleznables, repudiados por todos y de superior gravedad. Tal es así, que se distinguen como *clase aparte*, aun por encima de los delitos tipificados como *graves*. De hecho, las sociedades antiguas condenaban al ostracismo a los llamados parias, que cometían el delito último contra la patria: *la traición.*[14] *En su sustrato, ambos delitos inciden sobre el deber de lealtad.* El primero, el de todo ciudadano; el segundo, del servidor público, cuya fidelidad y compromiso debe ser la de cumplir sus funciones sin otra recompensa que su sueldo y la satisfacción del deber cumplido. Esta realidad explica por qué la mayoría de las constituciones destacan, en ese orden, la traición y el soborno como delitos graves aparte, cuya máxima gravedad amerita un residenciamiento. A todas luces, en recta hermenéutica, esta situación hace que descartemos la aplicación de la doctrina *ejusdem generis.* Véase *Buscaglia, Tes. v. Trib. Contribuciones,* 69 D.P.R. 99, 106–108 (1948).

---

éstos sean de la misma categoría gramatical, es decir, que estén coordinados o que uno de ellos tenga primacía sobre el otro, o sea, que uno esté subordinado al otro. Hay, pues, dos (2) clases de conjunciones: coordinantes y subordinantes. Las coordinantes, como la *o*, unen dos (2) o más elementos de una oración; dos (2) preposiciones que, juntas, forman una oración compuesta. (Énfasis suplido.) Mínguez Fontán, *op. cit.*

[14] "En efecto, el balance es entre mantener una democracia que enaltece el derecho del pueblo a cambiar su gobierno y el mantener la integridad de la nación y su seguridad ante el enemigo extranjero." (Traducción nuestra.) M. Cherif Bassiouni, *Substantive Criminal Law,* Illinois, Thomas Books, 1978, Cap. I, Sec. 1.1-*Treason,* pág. 5.

El texto de la Constitución es claro y sólo procede una interpretación gramatical, lógica y espiritual, hecha en el mismo ánimo de claridad y llaneza con el que fuera redactada. Nuestros constituyentes *cualificaron exclusivamente los delitos menos grave (que impliquen depravación moral) y no los delitos graves. Objetamos que de un plumazo judicial se trastoque la Constitución y transfiera a los tribunales el poder, delegado exclusivamente a las cámaras legislativas, de determinar cuáles delitos graves son causas de expulsión. Con esa actuación estamos usurpando poderes legislativos vitales, y para todos los efectos —en materia de la disciplina de los legisladores— reduciendo esa rama de gobierno a una agencia administrativa más, sujeta a la más amplia intervención de la Rama Judicial.*

*Vista la cuestión en los méritos, no hay la más mínima constancia que avale ese enfoque.* Como ya hemos dicho, distinto de la situación prevaleciente en la época colonial norteamericana —1787— para 1952, en Puerto Rico, nuestros padres de la Constitución conocían y distinguían claramente la diferencia entre delito grave y menos grave. *Rehusamos suscribir la premisa de que nuestra Constitución es una copia al carbón de la federal y que la diferencia es sólo el idioma.*

Según esa tesis, se podría residenciar a un legislador o funcionario cuando incurra en un *delito grave* que atente contra la función pública, pero no cuando el delito grave se configure contra una o varias personas particulares. Se *devalúan y menosprecian* los delitos cuyos derechos tutelados son la protección de la vida humana y el patrimonio *individual. Bajo este estrecho supuesto, el Legislador, Gobernador, Contralor o Juez del Tribunal Supremo, estaría inmune de sufrir un juicio de residenciamiento, aún ha-*

*biendo cometido un delito grave distinto.*(15) *Nadie debería estar por encima de la Constitución y la Ley.*

A poco reflexionemos, notaremos que al delimitar los delitos graves para residenciamiento a aquellos que "reflejan tal ausencia de juicio, menosprecio hacia el bienestar común o falta de respeto por la ley, que implican la carencia del nivel mínimo de integridad y juicio para desempeñar las responsabilidades del cargo", están realmente creando una *nueva definición de depravación moral, ahora sólo para delitos graves.* Se trata de una redacción poco feliz, cuya ambigüedad y redundancia derrota cualquier intento racional de aplicación jurídica *objetiva futura,* no sólo para los legisladores, sino para cualquier persona que ocupe el cargo de Gobernador, Contralor o Juez del Tribunal Supremo. Nos preguntamos si la referencia a "ausencia de juicio" significa no poder distinguir el bien del mal; lo verdadero de lo falso; no entender algo; estar demente. No sabemos si "menosprecio hacia el bienestar común" excluye el desprecio individual y desdén de la dignidad del ser humano. La frase "o falta de respeto a la ley" es sólo un típico pleonasmo; pues todo delito, por definición, *es un "quebrantamiento de la ley".* (Énfasis suplido.) *Diccionario de la Lengua Española,* Madrid, Ed. Espasa-Calpe, 1992, pág. 478. Finalmente, ¿cuáles de los delitos graves implican ausencia del *mínimo de integridad y juicio para desempeñar* las responsabilidades del cargo de Legislador, Gobernador, Contralor o Juez del Supremo? Tales preguntas

---

(15) Así podrían ser: Asesinato, homicidio, aborto, agresión agravada, mutilación, seducción, sodomía, bestialismo, actos lascivos e impúdicos, incesto, bigamia, secuestro, robo, abandono de menores, apropiación ilegal agravada, recibo de bienes apropiados ilegalmente, escalamiento agravado, robo, extorsión, daño agravado, fraude, incendio, estragos, soborno de testigos, perjurio, fuga, menaza de testigos, destrucción pruebas, preparar o presentar escritos falsos, influir en un jurado, emplear violencia, intimidación contra la autoridad pública, motín, conspiración, encubrimiento, falsificación de documentos, posesión ilegal de armas, portación ilegal de armas, posesión de sustancias controladas, uso indebido de la tarjeta de identificación electoral, alterar documentos electorales y delitos relacionados con la violencia doméstica.

carecen de una contestación, a nuestro modo de ver, luego de examinar el asunto de hecho y de derecho que está ante nuestra consideración.

El criterio restrictivo de que tales delitos son aquellos ofensivos a la función pública o que representen un abuso a la confianza pública *es extraconstitucional, producto de la inventiva judicial.* Pasa por alto que, en su esencia, todo delito, por definición, contiene el elemento de *antijuridicidad;* o sea, quien delinque incurre en una falta de respeto y en una conducta contraria a la ley, no justificada o excusada por el ordenamiento jurídico, clasificada por el legislador como *grave.*

Sin embargo, nuestra principal preocupación por esta limitante incursión judicial es que, a priori, están *usurpando las distintas prerrogativas constitucionales de las cámaras legislativas y, a la postre, convirtiéndonos en jueces-partes.* Nos explicamos:

Aparte de los legisladores, los procesos de residenciamiento, queda dicho, *cubre sólo* al Gobernador, al Contralor y a los *Jueces de este Tribunal Supremo.* Bajo la tesis restrictiva de que la causa no es todo delito grave, estamos, para todo efecto, *reservándonos la facultad judicial de mañana decir cuáles son.* En otras palabras, de nueve (9) funcionarios que bajo la Constitución pueden ser residenciados, seis (6) —los Jueces de este Tribunal Supremo— nos hemos atribuido la facultad de decidir por qué causa podemos ser residenciados, independientemente de que antes las Cámaras, por mayoría absoluta, lo hayan decidido por conducta tipificada como delito grave. *Ello trastoca peligrosamente el sensitivo balance constitucional de poderes.* "...
[E]l equilibrio entre los poderes se asemeja a la relación de los vasos comunicantes, donde el nivel del líquido es el mismo pero, si con un émbolo se oprime el de uno de ellos o el de los dos, ese nivel acrecerá al o los restantes. No puede haber vacío, sin que lo llene otro u otros, y tampoco puede

darse entre los poderes." L.M. Boffi Boggero, *Reflexiones sobre el Poder Judicial*, 1978-B Rev. Jur. Arg. La Ley 848, 851 (1978).

VI

Es evidente que el esquema del proceso de residenciamiento de nuestra Constitución está inmerso *en el principio de legalidad* proclamado en el Art. 8 del Código Penal, *supra*, a saber, que la conducta esté configurada y tipificada antes como delictiva. Recordemos, además, que la Asamblea Legislativa tiene la *facultad constitucional exclusiva* de tipificar delitos y clasificarlos en graves o menos graves. *Pueblo v. Martínez Torres*, 116 D.P.R. 793, 796 (1986); *Pérez Vega v. Tribunal Superior*, 93 D.P.R. 749, 759 (1966), y casos allí citados; D. Nevares-Muñiz, *Código Penal de Puerto Rico*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1993, pág. 21.

En recta hermenéutica, la interpretación armoniosa y razonable bajo los Arts. 4.2 y 4.11 de la Ley de Ética Gubernamental del Estado Libre Asociado, 3 L.P.R.A. secs. 1831 y 1841, a tono con la *intención legislativa*, refleja que el delito grave se configura cuando el funcionario *"dej[a] de radicar o divulgar cualquier información sustancial"* —(énfasis suplido) 3 L.P.R.A. sec. 1841— requerida, "no más tarde del 1ro. de mayo de cada año". La sola omisión en presentar en esa fecha el informe —o dentro del término prorrogado por el Director de la Oficina de Ética, que nunca podrá exceder sesenta (60) días— *es una violación penal.*

Una interpretación en contrario ignoraría el principio elemental sobre el *tiempo del delito (tempus delicti)* consagrado en el Art. 11 del Código Penal, esto es, que el "delito se considera cometido ... [e]n el *momento* en que debía ejecutarse la acción omitida ...". 33 L.P.R.A. sec. 3043. Por ende, es ineludible concluir que la *no presentación* por el

Senador Nogueras Cartagena de los tres (3) informes financieros a la Oficina de Ética Gubernamental —correspondientes a los años 1992, 1993 y 1994, en o antes del 1ro de mayo— *constituyó claramente un delito grave.* Es erróneo afirmar que las demoras de dieciséis (16), veinte (20) y doce (12) meses, respectivamente, lo eximieron de esa infracción penal.

*La omisión antijurídica o el incumplimiento consciente o deliberado de un deber tipificado por la Asamblea Legislativa como delito grave en la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, consistente en dejar de rendir a tiempo un informe financiero, jamás puede reducirse a una simple omisión de carácter ministerial, caracterizable sólo como "reprobable"; menos, convertir en directivo lo imperativo: la fecha límite para su presentación.*

Esta realidad es suficiente para sostener la conclusión del Senado de que el licenciado Nogueras Cartagena "violó la Ley Núm. 12 de junio de 1985 al no radicar sus informes financieros conforme a la ley, actuando a sabiendas y voluntariamente y debe estar sujeto a las medidas que la Comisión estime pertinente". Apéndice, pág. 291.

*En cuanto a dejar de rendir a tiempo sus planillas de contribución sobre ingresos, tampoco puede seriamente argüirse que no está tipificado como delito.* Así lo decidieron nuestros legisladores desde 1954 al aprobar la Ley Núm. 91 de 29 de junio de 1954 (13 L.P.R.A. ant. sec. 3001 *et seq.*), en que establecieron que tal omisión sería delito *menos grave.* Después, mediante la Ley Núm. 47 de 7 de junio de 1977 (13 L.P.R.A. ant. sec. 3145(a), (c)) —aplicable al Senador Nogueras Cartagena— se clasificó como *delito grave*; y recientemente, a través de la Ley Núm. 120 de 31 de octubre de 1994 (13 L.P.R.A. sec. 8009 *et seq.*) —vigente desde el 30 de junio de 1995, según enmendada por la Ley Núm. 223 de 30 de noviembre de 1995— se redujo a *menos grave,* aunque *se convierte en delito grave cuando la omi-*

*sión es voluntaria, "con la intención de evadir o derrotar cualquier contribución impuesta por [el Código]".* (Énfasis suplido.) 13 L.P.R.A. sec. 8054(a). El récord legislativo revela que el Senador Nogueras Cartagena *votó a favor de ambas enmiendas.*

En el pasado hemos rechazado la contención de que, antes de acudir a la vía penal, es menester recurrir a la práctica administrativa de llenar la planilla "de oficio". *Pueblo v. Lausell Hernández,* 121 D.P.R. 823, 837–838 (1988). Como sentenció el Juez Asociado Señor Hernández Denton en su opinión concurrente —a la cual se unió la Juez Asociada Señora Naveira de Rodón— esa decisión "permit[ió] reafirmar nuestros pronunciamientos anteriores de que, *en el caso de no rendir la planilla de contribución sobre ingresos,* 'la voluntariedad *sólo requiere* prueba de que el contribuyente dejó de radicar su planilla contributiva intencionalmente no obstante tener conocimiento de tal obligación y *no debido a un accidente, error u otra causa inocente ...'. Pueblo v. Rivera Adorno,* 99 D.P.R. 555, 562 (1971)". (Énfasis suplido.)[16] *Íd.,* pág. 843.

## VII

En cuanto a los "delitos menos grave, que impliquen depravación", desde la época de la Constitución hasta el presente se ha reconocido que el concepto *depravación moral* en las leyes significa " 'un estado o condición del individuo, compuesto por una deficiencia inherente de su sentido de la moral y la rectitud; en que la persona ha dejado de preocuparse por el respeto y la seguridad de la vida humana y todo lo que hace es esencialmente malo, doloso, fraudulento, inmoral, vil en su naturaleza y dañino en sus

---

[16] Véanse, además: *Pueblo v. Corales Irizarry,* 107 D.P.R. 481 (1978); *Pueblo v. Tursi,* 105 D.P.R. 717 (1977); *Pueblo v. Rivera Adorno,* 99 D.P.R. 555 (1971); *Pueblo v. Calzada,* 93 D.P.R 803 (1966); *Pérez Vega v. Tribunal Superior,* 93 D.P.R. 749 (1966); *Pueblo v. Franceschi,* 74 D.P.R. 825 (1953); *Pueblo v. Pietersz,* 61 D.P.R. 237 (1943).

consecuencias'. *Morales Merced v. Tribunal Superior*, 93 D.P.R. 423, 430 (1966); *In re Rivera Cintrón* [114 D.P.R. 481, 491 (1983)]". *In re García Quintero*, 138 D.P.R. 669, 671 (1995). "El Diccionario de la Lengua Española, en su decimaoctava edición, nos dice que la voz 'Depravar', significa viciar, adulterar, corromper, y que 'Depravadamente', significa malvadamente, con malicia suma." *Morales Merced v. Tribunal Superior*, supra, pág. 430.

Estos pronunciamientos y precedentes judiciales, *invocados por la Comisión de Ética y rubricados por el Senado*, son claramente aplicables a los juicios de residenciamiento. *Han de servir para medir en la misma balanza de la justicia a todos por igual: Legisladores, Gobernador, Contralor y Jueces del Tribunal Supremo. No existe razón ni justificación alguna para apartarnos, reformular o relajar esta doctrina. Particularmente, es ello así en los momentos de crisis moral, como el que vivimos.*

## VIII

En el ámbito procesal, la naturaleza constitucional e inherente de la facultad de expulsión libera a los cuerpos legislativos "de toda rutina procesal y le permite seleccionar el procedimiento conveniente, sin más limitación que la garantía de un debido proceso [de ley]". *In re Cancio Sifre*, 106 D.P.R. 386, 389 (1977).

El "debido proceso de ley, encarna la esencia de nuestro sistema de justicia. Su prédica compendia elevados principios y valores que reflejan nuestra vida en sociedad y el grado de civilización alcanzado. Es herencia de nuestros antepasados, fruto de nuestro esfuerzo colectivo y nuestra vocación democrática de pueblo." *Amy v. Adm. Deporte Hípico*, 116 D.P.R. 414, 420 (1985). En su vertiente procesal, obliga a un procedimiento justo y equitativo que respete la dignidad del afectado. *Rodríguez Rodríguez v. E.L.A.*, 130 D.P.R. 562 (1992); *Rivera Santiago v. Srio. de Hacienda*,

119 D.P.R. 265 (1987); *López Vives v. Policía de Puerto Rico*, 118 D.P.R. 219 (1987). Exige oportuna y adecuada notificación, vista, *prueba robusta y convincente*,([17]) derecho a ser oído, a confrontar los testigos de cargo, y presentar prueba y argumentos en su defensa. *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 730 (1982); *Ortiz Cruz v. Junta Hípica*, 101 D.P.R. 791, 795 (1973).

Aquí, como representante de los miles de electores que lo endosaron en las urnas, el interés implicado trasciende el simple derecho propietario del licenciado Nogueras Cartagena a su escaño en el Senado.([18]) Ahora bien, el derecho

---

([17]) Como parte del debido proceso de ley, la medida *quantum* de prueba tiene como función primordial instruir al juzgador sobre el *grado* de confianza que la sociedad requiere en la corrección de sus determinaciones de hecho e importancia adherida a su decisión final. *In re Winship*, 397 U.S. 358, 370 (1970). De un lado del espectro tenemos el caso civil que implica una disputa, monetaria o de otra índole, *entre partes privadas*. La preocupación social en su adjudicación final es *mínima* y, por ende, la medida *preponderancia de prueba*. El riesgo de una adjudicación errónea la comparten las partes privadas litigantes en la misma proporción aproximadamente.

Al otro extremo están los casos criminales. Los intereses del acusado son de tal magnitud que han sido protegidos constitucionalmente con una medida de prueba que minimiza la posibilidad de una adjudicación final errónea, a saber, *más allá de duda razonable*. Al aplicarla, la sociedad carga el riesgo del error. *In re Winship*, supra.

En el *medio del espectro* se encuentra una medida *intermedia* que, aunque no ha sido tan utilizada como las otras dos, "no es extraña a la adjudicación civil". (Traducción nuestra.) *Woodby v. Inmigration Service*, 385 U.S. 276, 285 (1966). C.T. McCormick, *Handbook of the Law of Evidence*, Minnesota, West Publishing Co., 1954, Sec. 320; 9 *Wigmore on Evidence* Sec. 2498 (3ra ed. 1940). Esta medida usualmente contiene adjetivos tales como "clara", "robusta", "convincente" con e "inequívoca". Ha sido aplicada en casos que implican alegaciones de conducta cuasi criminal o *derechos fundamentales* del individuo —*P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199, 222–224 (1981)— estimados más importantes que aquellos de litigación civil pura.

Determinar qué medida de prueba satisface los requisitos del debido proceso de ley en situaciones en que un legislador es expulsado, conlleva evaluar: (1) el interés privado afectado por la acción gubernamental; (2) el riesgo de una decisión errónea que prive al legislador de su escaño a través del procedimiento utilizado, y (3) el interés gubernamental promulgado por el procedimiento en cuestión. *Mathews v. Eldridge*, 424 U.S. 319, 332–333 (1976); *Santosky v. Kramer*, 455 U.S. 745 (1982); *Rivera Rodríguez & Co. v. Lee Stowell, etc.*, 133 D.P.R. 881 (1993).

([18]) Recientemente, en nuestro disenso en *P.P.D. v. Peña Clos I*, supra, págs. 851-852, dijimos:

"La expresión de la voluntad del pueblo mediante sufragio universal *impone a todo candidato electo por un partido político* la obligación de abogar por una sana administración pública y adelantar los planes sociales, económicos y políticos de su partido que se sometieron al electorado. Conscientes de que la democracia se nutre

del licenciado Nogueras Cartagena no es absoluto; conlleva unos deberes y obligaciones público-privados y es concedido y reglamentado por la Constitución, la Ley Electoral de Puerto Rico, otras leyes y el Código de Ética del Senado. *La función del legislador es vital, parte constitutiva y necesaria de nuestro sistema de gobierno democrático.* Sin ella, la Asamblea Legislativa no podría funcionar.

En el ámbito individual, todo legislador es acreedor a unas prerrogativas y emolumentos, en ocasiones, el único medio de generar ingresos y sostener a su familia. Una vez despojado de su escaño, esos ingresos se ven afectados. Además, su reputación queda opacada ante la sociedad, creando así un estigma difícil de eliminar.

Vemos que estamos ante *un interés público sustancial. Board of Regents v. Roth*, 408 U.S. 564 (1972). La Constitución visualiza que los legisladores estén moralmente capacitados para desempeñar sus cargos. Provee para proteger la sociedad en general contra actuaciones reñidas con la ley y los cánones de ética. Ello incrementa el interés gubernamental de minimizar el riesgo de una adjudicación errónea; he ahí la importancia de una medida de prueba adecuada. Según hemos indicado, la Constitución no requiere una convicción previa. Resultaría excesivamente estricta la medida del juicio criminal —*más allá de duda razonable*— en que está involucrada la libertad física del acusado, en ocasiones, a perpetuidad. También sería muy

---

de la libre expresión y el intercambio de ideas en un ambiente de respeto mutuo, no cabe imponerle a los candidatos electos una *disciplina partidista férrea* y *absoluta* que ahogue sus conciencias y libertad de expresión. En el ejercicio de su independencia de criterio, como veremos, la opinión de un legislador sobre determinado asunto puede, en ocasiones, estar en conflicto con la de su partido o *caucus*, ello *sin temor de ser castigado o expulsado del escaño.* Véase M.L. Stokes, *When Freedoms Conflicts: Party Discipline and the First Amendment*, XI J. Law Politics 751 (1995).

" 'Un gobierno representativo requiere dar a los legisladores la más amplia latitud para expresar sus puntos de vista en asuntos de política. ... Los legisladores tienen la obligación de asumir posiciones sobre asuntos políticos controversiales de forma que su *electorado* esté adecuadamente informado y mejor capacitado para evaluar sus cualificaciones para el cargo; *también para que estén representados en los debates gubernamentales por la persona que seleccionaron como su representante.'* (Traducción nuestra y énfasis suplido.) *Bond v. Floyd*, 385 U.S. 116, 136–137 (1966)." (Énfasis en el original.)

flexible la de los casos civiles —*preponderancia de la prueba*— en los cuales el Estado delega ese riesgo en los litigantes privados.

Un procedimiento de residenciamiento, aunque *cuasijudicial*, es *sui generis*, o sea, no es susceptible de ser enmarcado estrictamente y con rigor científico dentro de las categorías tradicionales de lo civil o criminal. No ocurre entre partes privadas; interviene el poder gubernamental a través de una o ambas cámaras legislativas. El derecho que se reglamenta es de más importancia que la mera pérdida salarial y económica de un individuo. Si para anular el voto de un sólo elector se requiere una *prueba robusta y convincente —P.P.D. v. Admor. Gen. de Elecciones*, supra— *mayor justificación existe cuando está en juego dejar sin representación a miles de electores*. Además, la reputación del legislador puede quedar manchada permanentemente.

Aflora, pues, que los trámites disciplinarios contra los legisladores están constitucionalmente enmarcados en un *plano intermedio* en cuanto a prueba se refiere. Debemos exigir una medida de prueba ajustada a esa característica y la importancia que la sociedad le atribuye a los intereses y derechos individuales-gubernamentales implicados. Al balancear la substancialidad del interés que tienen los cuerpos legislativos para dictar las pautas disciplinarias y garantizar a la sociedad que sus miembros cumplan con los mandatos legales y éticos, concluimos que su naturaleza hace imperativo que se adjudique con *prueba robusta y convincente*.

Con estos pronunciamientos en mente, examinemos los señalamientos del licenciado Nogueras Cartagena.

## IX

Sostiene él que no se cumplió con las garantías mínimas del debido proceso de ley. *No tiene razón*.

Las *constancias documentales* ante nos revelan satisfac-

toriamente que su expulsión se ajustó a ese principio constitucional. El Senado cumplió con todas las garantías mínimas del debido proceso de ley: notificación oportuna, derecho a estar representado por abogado, tiempo suficiente para prepararse y defenderse, y celebración de vistas evidenciarias.[19] Con vista a *prueba robusta y convincente*, lo expulsó.

El señalamiento del licenciado Nogueras Cartagena de parcialidad del juzgador *es frívolo.* La propia Constitución faculta a cada uno de los cuerpos legislativos a castigar a sus miembros e, incluso, a expulsarlos, sujeto exclusivamente a dos (2) limitaciones: concurrencia de tres cuartas (3/4) partes y por las causas establecidas en el Art. III, Sec. 21 de nuestra Constitución, *supra. Estamos ante un diseño de génesis constitucional que derrota el argumento de que el Senado no puede acusar y juzgar simultáneamente.* La

---

[19] El 5 de febrero de 1996, la Comisión de Ética le comunicó la intención de evaluar los hallazgos de la Contralor de Puerto Rico sobre su persona en el *Informe de Auditoría* (CPED-95-16) de 28 de julio de 1995. El hallazgo principal señala que el Senador Nogueras Cartagena incumplió con las disposiciones de la Ley Núm. 13 de 24 de junio de 1989 (2 L.P.R.A. sec. 28), que requiere la presentación de una declaración jurada ante el Secretario de la Cámara correspondiente, sobre doscientos mil dólares ($200,000) de ingresos devengados, adicionales a su salario de legislador.

Posteriormente fue notificado de una vista privada con oportunidad de comparecer asistido de abogado y rebatir la decisión de la Comisión de Ética de evaluar el susodicho Informe. Optó por comparecer solo y solicitó su posposición para el 29 de febrero, para contratar su representación legal.

Una vez comenzó la vista, argumentó que la Comisión de Ética carecía de jurisdicción sobre el asunto. Expuso que existieron fallas en el proceso de notificación y que existía parcialidad en sus miembros. Dicha vista fue suspendida abruptamente, tras un intercambio de acusaciones entre el entonces investigador de la Comisión de Ética —Lcdo. Luis Plaza Mariota— y el Senador Nogueras Cartagena. Antes de concluir los trabajos, la Comisión de Ética señaló la continuación para el día siguiente.

El licenciado Nogueras Cartagena *no compareció.* Durante esa vista, la Comisión de Ética decidió ampliar la investigación para incluir unos aspectos relativos a las leyes de Ética Gubernamental y Contribución sobre Ingresos. *Ese día se le notificó por escrito, tanto a él, como a su abogado.* A partir de esa fecha, comenzó a transcurrir el plazo de quince (15) días, dispuesto en el Código de Ética del Senado, para que se expresara sobre este nuevo aspecto. El plazo venció el 18 de marzo. Expirado dicho plazo, el Senador Nogueras Cartagena solicitó la celebración de *otra vista privada*, que fue señalada para el 30 de marzo.

Durante esta *tercera* vista, el investigador de la Comisión presentó dos (2) testigos. El licenciado Nogueras Cartagena los contrainterrogó. Además, fue advertido de su derecho a presentar prueba a su favor. *No ejerció ese derecho.*

Comisión de Ética se limita a investigar, recopilar, recibir prueba y hacer sus recomendaciones. Es el pleno del Cuerpo, a través de sus miembros, el que adjudica. Aquí, el Senado en pleno adoptó las conclusiones y recomendaciones del Informe de la Comisión de Ética. Así aprobado, impuso al Senador Nogueras Cartagena el castigo más severo reconocido por la propia Constitución. El demandante Nogueras Cartagena no ha podido demostrar prejuicio durante un proceso en el cual tuvo la oportunidad de defenderse. Él adoptó como estrategia no hacer uso de algunas de las garantías reconocídales por la Comisión de Ética. *No constituye prejuicio el no haber prevalecido.*([20])

Sabido es que el proceso de expulsión de un miembro de la Asamblea Legislativa, *único en su naturaleza, tiene lugar en el epicentro del poder político.* Incluso, a veces, es llamado "juicio político". *Como tal, los miembros del Cuerpo no están ajenos de ser influenciados por la opinión pública, sus prejuicios y el debate partidista. Por ende, de ordinario, toda expulsión de un legislador es susceptible de ser considerada por el afectado, terceros —incluso jueces— como un acto discriminatorio o de represalia política; máxime si se compara con las sanciones disciplinarias más leves aplicadas a otros* legisladores que han incurrido en conducta análoga o parecida.([21])

Según antes indicado, concientes de la probabilidad del abuso partidista, la Asamblea Constituyente estableció el requisito mínimo de tres cuartas (3/4) partes y las causales de traición, soborno, otros delitos graves y delitos menos

---

([20]) Su alegación de que fue privado de asistencia legal durante la sesión plenaria de 25 de abril, en la cual se decretó su expulsión, carece de méritos. Precisamente fue a instancias suyas que el asunto se discutió en dicha sesión. Más aún, ante una moción de posposición de las minorías —derrotada— expresó su disposición para rebatir durante esa sesión el Informe de la Comisión de Ética, *lo cual intentó sin éxito.*

([21]) La independencia de acción entre el Senado y la Cámara de Representantes no permite argüir un trato diferencial discriminatorio porque uno de los cuerpos actúe de manera distinta, deje de imponer o imponga sanciones más leves. La Constitución concede la facultad de expulsar a cada Cuerpo por separado.

graves, que impliquen depravación. No cabe, pues, validar el argumento de que su expulsión es nula por constituir un "encausamiento selectivo", motivado por sus constantes discrepancias con la política pública establecida por el P.N.P., su partido. A fin de cuentas, su expulsión fue producto de una votación en la que participaron y votaron a favor miembros del P.P.D. y P.I.P.

*Repetimos, la expulsión del Senador Nogueras Cartagena descansó en el ejercicio discrecional conferido por la Constitución al Senado. Aunque discrepemos en algunos extremos del rigor de esa decisión, no es función de los tribunales pasar juicio sobre su sabiduría; tampoco dejarla sin efecto o cambiarla.* Menos aún, vía *juicio de novo*, sustituir el juicio valorativo y el descargo fiel de la conciencia individual de veintitrés (23) Senadores por el de mayoría simple de los Jueces de este Foro. *La Constitución no confirió a los Jueces de este Tribunal esa facultad.*

En recta juridicidad, *no es posible reconciliar la sentencia mayoritaria* en *P.P.D. v. Peña Clos I,* supra —que se negó a "expulsarlo" bajo la teoría de que este Tribunal carecía de autoridad para así ordenárselo al Senado— con la tesis que ahora se propone —cuando el Senado ha ejercido expresamente esa facultad— intervenir y dejarla sin efecto a base de erróneamente interpretar que no se configuró ningún delito grave.

## X

La prueba documental y testifical estableció que el licenciado Nogueras Cartagena *no rindió en el plazo de ley* sus informes financieros para los años 1992, 1993 y 1994 en la Oficina de Ética Gubernamental. Lo hizo con una tardanza notable inexcusable. Se *excedió* en las prórrogas concedidas por el Director de esa oficina e incurrió así en el *delito grave* configurado en el Art. 4.11 de la Ley de Ética

Gubernamental del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 1841.(²²)

*Por propia admisión, no sometió a tiempo sus planillas para los años 1991, 1992 y 1993, en violación de la Ley Habilitadora de la Reforma Contributiva de 1994 —según enmendada por la Ley Núm. 47, supra— que entonces tipificaba esa acción como delito grave.* 13 L.P.R.A. ant. sec. 3145(c). Resulta, pues, incomprensible e ilógico descartar livianamente este cargo. Argumentar que el Senado no debió expulsarlo porque la propia Asamblea Legislativa reclasificó el 30 de noviembre de 1995 dicho delito como uno menos grave, es una apreciación jurídica errónea e insostenible por representar una indebida intervención judicial con las conciencias de los miembros del Senado que lo juzgaron.

Al aprobar la Ley Núm. 47, *supra*, la Asamblea Legislativa ponderó el valor social tutelado y consideró "que no rendir una planilla de contribución sobre ingresos [como] un delito más grave que los otros dos [pagar la contribución y conservar información para los fines de la Ley], *ya que constituye un fraude al tesoro*". XXXI Diarió de Sesiones de la Asamblea Legislativa (Cámara), 4 de mayo de 1977. Esa clasificación más severa buscaba "erradicar la práctica injusta e indeseable de no rendir planillas de contribución sobre ingresos". Íd.

Durante el cuatrienio en que se aprobó la Ley Núm. 47, *supra,* el licenciado Nogueras Cartagena era miembro del Senado. *Votó a favor de dicha pieza legislativa.*(²³) Socavaríamos el prestigio del Senado si suscribiéramos una tesis cuyo resultado fuera condonar la conducta delictiva de un legislador —aquí el licenciado Nogueras Cartagena— para

---

(²²) Además, *no informó*, en 1993, una partida de ingresos extralegislativos de doscientos mil dólares ($200,000) en concepto de honorarios de abogado, según lo exige la Ley Núm. 13 de 24 de junio de 1989 (3 L.P.R.A. secs. 2, 2 n., 34, 574 y 577 n.; 2 L.P.R.A. secs. 28, 28 n. y 75 n.).

(²³) XXXI (Núm.73) Diario de Sesiones de la Asamblea Legislativa (Senado), 23 de mayo de 1977.

eximirlo precisamente del propio estatuto que, por sí mismo, clasificó su acción como *delito grave. Judicialmente no podemos avalar un privilegio tan irritante.* "[L]a justicia ... no reconoce castas ni jerarquías ...". *Moreno v. Gore, Gobernador*, 46 D.P.R. 408, 417 (1934).

Aún bajo la ley actual, por sí solo, sería suficiente causa de expulsión por tratarse todavía de un delito grave ("intención de evadir") o, en la alternativa, "delito menos grave", que implica depravación por constituir fraude al tesoro público. *In re Rivera Cintrón*, supra.

En *conclusión*, del Informe de la Comisión de Ética del Senado surge un *patrón de conducta* de parte del licenciado Nogueras Cartagena acumulado durante tres (3) años. *Sus actuaciones equivalen a delitos graves y revelan un absoluto menosprecio por la ley y de los deberes que, como legislador, le impone nuestro ordenamiento.*

*Esa conducta viola los principios básicos de honradez y moral. Su comportamiento es indicativo de faltar al deber jurídico social, exigido de todo ciudadano, de rendir sus planillas en tiempo. Como formulador de leyes y creador de política pública de nuestro país, a todo legislador se le debe exigir, por lo menos, comportarse de manera ejemplar, como una persona respetuosa de la ley.*

*Incurrió el licenciado Nogueras Cartagena en conducta fraudulenta indicativa de depravación moral al no rendir repetidamente sus planillas e informes financieros y al ocultar ingresos de manera intencional. Ante sus pares, tal conducta es grave e indigna de un Senador. El licenciado Nogueras Cartagena traicionó el buen nombre de la Institución a la que juró servir de manera honorable.*

"Cada falta de un funcionario de justicia es una herida al sistema, y *avanza como onda concéntrica* para lesionar el buen nombre y el prestigio de la institución." (Énfasis suplido.) *In re Feliciano*, 106 D.P.R. 806, 809 (1978). *Estamos ante un trágico y lamentable precedente.* "En nuestra democracia, nadie está sobre el imperio de la ley." (Énfasis

suprimido.) *El Vocero de P.R. v. Nogueras I*, 138 D.P.R. 103, 132 (1995), opinión disidente.

— O —

Opinión disidente emitida por la Juez Asociada Señora Naveira de Rodón, a la cual se une el Juez Presidente Señor Andréu García y el Juez Asociado Señor Fuster Berlingeri.

> Creo que el único modo de ser útil a las ideas y a los pueblos es *levantar los hombres a la discusión de su deber*, más que bajar con ellos a la *negociación de sus intereses*. (Énfasis suplido.) Eugenio María de Hostos, *Para todos los días: Hostos Aforismos*, San Juan, Instituto de Cultura Puertorriqueña, 1968, pág. 39. (Tomado de *Diario*, Vol. II, Obras Completas, 1939.)

I

Reconociendo la trascendencia que para el futuro de nuestro Pueblo tiene la controversia planteada y en cumplimiento con el deber que tenemos de interpretar nuestra Ley Fundamental en armonía con los principios básicos de justicia, es que abordamos el delicado y novel asunto presentado. El sistema constitucional bajo el cual convivimos exige que tanto la aplicación de la facultad que tienen los legisladores para expulsar a uno de sus miembros como la interpretación de su alcance, se haga con gran cautela, ciñéndose a lo estrictamente autorizado por nuestra Constitución. El esquema sobre expulsión adoptado por el Constituyente refleja tanto el reconocimiento del derecho de cada cámara a disciplinar a sus miembros, como un expreso y claro mandato de que el castigo máximo, la expulsión, sólo se puede utilizar en limitadas circunstancias y siempre que concurran en dicha decisión por lo menos tres cuartas (3/4) partes de los miembros que componen dicha cámara.

Lo anterior nos servirá de guía al delimitar la controversia que debemos atender. A la luz de las causas que enumera la Constitución para la expulsión de legisladores, debemos comenzar por determinar si como parte de su proceso de expulsión, al ex Senador Nicolás Nogueras Cartagena se le imputó la comisión de conducta constitutiva de delito grave o menos grave. De contestar esta primera interrogante en la afirmativa, procederíamos a analizar si la conducta delictiva imputada es de la naturaleza prevista por el Constituyente para que su comisión justifique la expulsión. De lo anterior se deduce que, al menos al principio, el análisis se circunscribirá a una determinación objetiva sobre la adecuación de la conducta imputada al legislador, a un tipo delictivo predeterminado en nuestro ordenamiento. Este análisis debe estar desprovisto de preconcepciones subjetivas de lo moral. Así tiene que ser, pues la aplicación arbitraria de criterios moralistas, aunque bien intencionada, puede dar al traste con nuestra organización gubernamental republicana. El juicio debe ser producto de un razonamiento lógico y desapasionado, tomando en consideración sólo los hechos que tuvo ante sí el Senado para decretar la expulsión.

Nuestro análisis nos lleva a concluir que la expulsión del ex Senador Nogueras Cartagena fue inconstitucional. La conducta que le fue imputada al ex legislador por la Comisión de Ética del Senado, que recomendó su expulsión, no constituye delito, y aun cuando lo constituyese, el mismo carece de los elementos previstos por el Constituyente para justificar la expulsión. El Art. III, Sec. 21 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, pág. 347, dispone, en lo pertinente, *como* causas para la expulsión sólo las siguientes: "la traición, el soborno, otros delitos graves, y aquellos delitos menos grave que impliquen depravación."(1) Por los

---

(1) Por entender que para la solución de la presente controversia no es necesario entrar a determinar si a tenor con la Sec. 21 del Art. III de la Constitución del Estado

fundamentos que expondremos a continuación, disentimos de la posición adoptada por una mayoría del Tribunal.

## II

A raíz de un informe preparado por la Oficina del Contralor en torno al ex Senador Nogueras Cartagena,[2] la Comisión de Ética del Senado (en adelante Comisión) decidió ejercer su jurisdicción disciplinaria e investigar el contenido del mismo. La Comisión le comunicó al ex Senador Nogueras Cartagena dicha decisión y, posteriormente, le indicó los asuntos que serían objeto de la investigación. En ese momento la misma cubriría las posibles violaciones al Código de Ética del Senado y a la Ley Núm. 13 de 24 de junio de 1989 (2 L.P.R.A. sec. 28). La Comisión también le notificó al ex Senador Nogueras Cartagena que el 26 de febrero de 1996 se celebraría una vista ante la Comisión.

Llegado el día señalado para la vista, el ex Senador Nogueras Cartagena compareció sin representación legal. Allí presentó una declaración suscrita bajo juramento en la cual repitió los planteamientos de falta de jurisdicción que mediante cartas dirigidas al Presidente de la Comisión, Hon. Ramón L. Rivera Cruz, había esbozado con anterioridad. A la luz de estos planteamientos, la Comisión decidió posponer la vista.

---

Libre Asociado, L.P.R.A., Tomo 1, se requiere una convicción previa, no discutiremos este asunto. Quisiéramos, sin embargo, expresar que sentimos una honda preocupación con relación a la posición que sobre este particular hoy adopta una mayoría de este Tribunal.

También entendemos que no es necesario que entremos en una disquisición sobre lo que significa "depravación moral" dentro del contexto de esta sección y si dicha frase modifica sólo a los delitos menos grave o si incluye a "otros delitos graves". Este análisis debe hacerse cuando el Tribunal tenga ante sí una situación de hechos concreta sobre el particular que permita el adecuado análisis de tan importante asunto.

[2] Se trata del Informe de Auditoría CPED-95-16 de 28 de julio de 1995, copia del cual fue remitida al Presidente del Senado, Hon. Roberto Rexach Benítez, en enero de 1996. Éste, a su vez, remitió el referido informe a la Comisión de Ética del Senado.

La vista se celebró el 29 de febrero de 1996. Después de haber dado comienzo a la misma, la Comisión la suspendió por motivo de una discusión que se suscitó entre el ex senador Nogueras Cartagena y el investigador designado por la Comisión, Lcdo. Luis A. Plaza Mariota.

La Comisión señaló la continuación de dicha vista para el 1ro de marzo de 1996. El ex Senador Nogueras Cartagena no compareció a dicha vista; tampoco presentó una excusa para justificar su ausencia. El Lcdo. Ricardo Soto Goytía, quien sustituyó al licenciado Plaza Mariota como investigador, informó a la Comisión que, a la luz de la investigación realizada, avalaba los hallazgos contenidos en el Informe de la Contralor relativos a las violaciones a la Ley Núm. 13, *supra*. También recomendó que se ampliara la investigación para considerar posibles violaciones a la Ley de Contribuciones sobre Ingresos de 1954 y a la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico (en adelante Ley de Ética Gubernamental). La Comisión acogió las recomendaciones del Investigador y así se lo notificó al ex Senador Nogueras Cartagena, concediéndole quince (15) días para que se expresara sobre estas nuevas imputaciones.

El ex Senador Nogueras Cartagena se expresó por escrito y, entre otras cosas, solicitó la celebración de una vista. La Comisión le ofreció al ex Senador Nogueras Cartagena varias fechas, entre las que éste debería escoger una para la celebración de la vista. Ésta se celebró el 30 de marzo de 1996. El ex Senador compareció sin representación legal y, por tal razón, solicitó la suspensión de la vista. La Comisión correctamente denegó la solicitud de suspensión por entender que no se había presentado una adecuada justificación para la ausencia y el ex Senador Nogueras Cartagena había tenido la oportunidad para escoger la fecha en la que se celebraría la misma.

En la vista el investigador presentó dos (2) testigos. Éstos fueron interrogados inicialmente por la Comisión y con-

trainterrogados por el ex Senador Nogueras Cartagena. Éste no presentó testigos a su favor.

Después de la vista, la Comisión notificó al ex Senador Nogueras Cartagena sus hallazgos y determinaciones. En un primer documento, de forma separada, se le notificaron los fundamentos que sostenían las alegadas violaciones a la Ley de Ética Gubernamental, Ley Núm. 12 de 24 de julio de 1985 (3 L.P.R.A. sec. 1801 *et seq.*). La conclusión de la Comisión en relación a estas violaciones fue que éstas fueron cometidas y que, por ello, se incurrió en conducta constitutiva de delito grave.

Posteriormente, la Comisión rindió su informe final, en el cual detalló los trámites del proceso celebrado, sus hallazgos y recomendaciones. La Comisión propuso la expulsión del ex Senador Nogueras Cartagena.

El 25 de abril de 1996, se le presentó el Informe de la Comisión al Senado en pleno. Después de escuchar las expresiones del ex Senador Nogueras Cartagena y de otros Senadores que solicitaron turno para hablar, el Presidente de la Comisión presentó una moción para que el Senado de Puerto Rico expulsara de su Cuerpo a Nogueras Cartagena. Con la concurrencia de veintitrés (23) Senadores a favor, el Senado decretó la expulsión.

El 1ro de mayo de 1996, el ex Senador Nogueras Cartagena presentó un recurso de *mandamus* ante este Tribunal contra el Presidente, la Secretaria y el Sargento de Armas del Senado de Puerto Rico. Los demandados comparecieron oportunamente solicitando la desestimación del recurso. Impugnaron la utilización del recurso de *mandamus* y la justiciabilidad de la controversia, aduciendo fundamentos derivados de la doctrina de cuestión política. Pasemos a analizar el recurso.

## III

En cuanto a la procedencia de la utilización del recurso de *mandamus* en nuestra jurisdicción original para cuestionar la actuación del Senado, no tenemos que extendernos mucho para avalarla. En el presente caso el promovente, el ex Senador Nogueras Cartagena, utiliza el recurso de *mandamus* para evaluar la actuación del Senado al destituirlo de su cargo. Nos indica que, en cumplimiento con preceptos constitucionales, los componentes del Senado no pueden expulsarlo, por lo que tienen un deber ministerial de reconocerle todos los derechos, atributos, prerrogativas y privilegios de su cargo como Senador y miembro del Senado del Estado Libre Asociado de Puerto Rico. Habiéndose negado a reconocerle éstos, una vez el ex Senador los solicitó, éste presentó el referido recurso ante nuestra consideración, en jurisdicción original. Analicemos la procedencia de la utilización del *mandamus* en casos como el presente.

Un análisis histórico de este recurso en equidad revela que sus contornos fueron originalmente delineados en el siglo XVII por el magistrado inglés Lord Coke, en el caso conocido como *James Bagg's Case*.(3) Allí, un funcionario público de la ciudad de Plymouth, quien fuera destituido ilegalmente de su puesto, acudió al tribunal solicitando un remedio. "El tribunal del 'King's Bench', presidido por Coke, expidió un auto de mandamus, en nombre del soberano, para que se le devolvieran al peticionario Bagg todos sus privilegios como funcionario de la ciudad." D. Rivé Rivera, *Recursos Extraordinarios*, Atlanta, Darby Printing Co., 1989, pág. 81. Esta antigua utilización del recurso encuentra conformidad en jurisprudencia de reciente cuño. A los efectos, hemos tenido la oportunidad de apuntar que "[e]l mandamus es un remedio adecuado para impedir que

---

(3) 11 Co. Rep. 93b 1615; 77 Eng. Rep. (K.B. Book VI) 1271 (1907). Véase D. Rivé Rivera, *Recursos Extraordinarios*, Georgia, Darby Printing Co., 1989, pág. 81.

un funcionario o junta separe de su empleo a un funcionario o empleado, sin autoridad para ello". (Énfasis suprimido.) *Soto v. Alcalde Municipio de Bayamón*, 99 D.P.R. 415, 420 (1970), y casos allí citados.

El *mandamus* se define como "un auto altamente privilegiado ... dirigido a alguna persona o personas naturales, a una corporación o a un tribunal judicial de inferior categoría ... requiriéndoles para el cumplimiento de algún acto que en dicho auto se exprese y que esté dentro de sus atribuciones o deberes". Art. 649 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3421. En cuanto a sus requisitos, la ley también dispone que no procederá la utilización del *mandamus* cuando exista otro recurso adecuado y eficaz en el curso ordinario de la ley. 32 L.P.R.A. sec. 3423. Véase, además, *Álvarez de Choudens v. Tribunal Superior*, 103 D.P.R. 235 (1975).

Hemos tenido también la oportunidad de expresarnos en cuanto al requisito de que el deber cuyo cumplimiento se solicita esté dispuesto por ley. A esos efectos rechazamos una aplicación estricta de este requisito, disponiendo que el deber no tiene que surgir expresamente de la ley. El "deber del demandado deb[e] surgir en forma clara y patente .... Si el deber surge o no claramente de las disposiciones aplicables es cuestión sujeta a interpretación judicial que no depende de un juicio a priori fundado exclusivamente en la letra del estatuto". *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 418 (1982).

Adicionalmente, en los casos como el presente, en que se invoca nuestra jurisdicción original, aplicamos unos criterios básicos para guiar nuestra discreción al decidir si debemos ejercerla. Los criterios aplicados son: (1) si el recurso se dirige contra principales funcionarios del Gobierno; (2) si se levantan cuestiones de gran interés público, y (3) si el problema planteado requiere una resolución pronta y definitiva. Véase *Dávila v. Superintendente*

*de Elecciones*, 82 D.P.R. 264, 274–275 (1960), y casos allí citados.

A la luz de la normativa expuesta, podemos concluir que en el presente caso proceden tanto la utilización del recurso de *mandamus* como la invocación de nuestra jurisdicción original.

## IV

Otro asunto que debemos analizar de forma preliminar a los méritos de la controversia se relaciona a la justiciabilidad del caso. Particularmente debemos atender la doctrina de la cuestión política, desarrollada como corolario del principio de justiciabilidad, con el propósito de guardar el balance en el ejercicio de los poderes constitucionales entre las distintas ramas de gobierno. Reiteradamente, hemos señalado una serie de criterios que guían nuestra discreción al decidir sobre la aplicación de la doctrina de cuestión política:

> Un tribunal se enfrenta a una cuestión política, no susceptible de adjudicación judicial, cuando existe uno de los elementos siguientes: (1) una delegación expresa del asunto en controversia a otra rama de gobierno; (2) ausencia de criterios o normas judiciales apropiadas para resolver la controversia; (3) imposibilidad de decidir sin hacer una determinación inicial de la política pública que no le corresponde a los tribunales; (4) imposibilidad de tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno; (5) una necesidad poco usual de adherirse sin cuestionar a una decisión política tomada previamente, y (6) potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos de gobierno sobre un asunto. *Noriega Rodríguez v. Jarabo*, 136 D.P.R. 497, 509 (1994).

Ante todo, sin embargo, siempre hemos reconocido también que en el ejercicio de este análisis no claudicamos nuestro deber como últimos intérpretes de la Constitución. Particularmente, en atención a la facultad que le confiere a

las Cámaras legislativas la Sec. 9 del Art. III de la Constitución del Estado Libre Asociado, *supra*, hemos dicho: "La Constitución les confiere determinadas facultades al Poder Legislativo y al Ejecutivo, pero la definición de sus contornos y la determinación de la validez de su ejercicio son asuntos cuidadosamente reservados a los tribunales." *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750, 759 (1977). Es esto exactamente lo que nos proponemos efectuar a continuación y la doctrina de cuestión política no nos lo impide.([4])

## V

Al analizar los hechos del presente caso a la luz de la normativa que expondremos, veremos que la validez de la actuación del Senado depende de la observancia de dos (2) tipos de requerimientos, ambos de orden constitucional. El primero es de naturaleza eminentemente procesal, mientras que el segundo es de carácter sustantivo.

A. En cuanto a los requerimientos de naturaleza procesal, hemos reconocido la necesidad de corroborar el cumplimiento de una serie de criterios para avalar el encausamiento seguido por el Estado que produzca la privación de algún derecho libertario o propietario. El derecho constitucional a un debido proceso de ley, en su vertiente procesal, trata de asegurar, sencillamente, la ejecución de un juicio justo. Ello se logra al proveer, al menos, las siguientes salvaguardas: adecuada notificación de los cargos presentados contra la persona querellada; oportunidad de confrontar la prueba en su contra; oportunidad de presentar

---

([4]) Sin embargo, la disposición constitucional contenida en la Sec. 14 del Art. III de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, págs. 342–343, a los efectos de que "todo miembro de la Asamblea Legislativa gozará de inmunidad parlamentaria por sus votos y expresiones", nos inclinaría a desestimar la acción en relación al demandado, Roberto Rexach Benítez, en su carácter de Senador; no así, sin embargo, en cuanto a su carácter de principal oficial administrador del Senado de Puerto Rico. *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977).

prueba a su favor; derecho a estar asistida por abogado, y la celebración de una vista.(5) La determinación del cumplimiento con los requisitos del debido proceso de ley, a la luz de los factores reseñados, sigue un análisis circunstancial y pragmático. *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993).

En conformidad con la norma antes expuesta, el Código de Ética del Senado(6) enumera una serie de derechos que quedarán garantizados en toda investigación que efectúe la Comisión de Ética. A esos efectos, queda dispuesto en el Art. 9(c) de dicho Código que:

> En la investigación de toda querella o imputación se salvaguardarán los siguientes derechos al querellado:
> 1) notificación oportuna de los cargos o querellas o reclamos en su contra;
> 2) conocer toda la evidencia en su contra aunque ésta no se utilice;
> 3) oportunidad de presentar evidencia;
> 4) estar representado por abogado;
> 5) contrainterrogar los testigos en su contra;
> 6) una adjudicación imparcial;
> 7) levantar un récord de los procedimientos;
> 8) que la decisión que se emita esté basada en hechos corroborados a través de la investigación; y
> 9) que la decisión se base en la totalidad del récord.

Según surge de los documentos que se nos han presentado, el procedimiento seguido ante la Comisión de Ética del Senado cumple con los requisitos impuestos por el derecho al debido proceso de ley, en su vertiente procesal. La Comisión le notificó oportunamente al ex Senador Nogueras Cartagena sobre los cargos presentados en su contra y sobre los cuales la Comisión conduciría una investigación. Igualmente se le notificó sobre la celebración de una vista para dilucidar los hechos referentes a los cargos presen-

---

(5) La expresión de estos factores se ha hecho mediante diversas enumeraciones. En esencia, sin embargo, todas éstas encarnan los mismos elementos. 2 *Davis, Administrative Law Treatise* Sec. 10:6 (1979).

(6) Aprobado mediante Resolución del Senado Núm. 130 de 12 de marzo de 1993.

tados. En la carta que a los efectos se le envió, se le informó también que tendría

> ... derecho en dicha vista a presentar, ampliar, o enmendar cualquier alegación previamente sometida por escrito a esta Comisión y podrá someter los documentos, evidencia, o prueba testimonial que estime pertinente para fundamentar sus alegaciones. Todos los derechos que le cobijan como imputado de las alegaciones previamente notificadas y los cuales aparecen enumerados en el Artículo 9, párrafo c del Código de [É]tica le serán celosamente salvaguardados por este Comité.

Además, durante la celebración de las vistas señaladas tuvo contacto con la evidencia que se presentaba en su contra y pudo efectivamente contrainterrogar los testigos que trajo el investigador de la Comisión. Los planteamientos presentados por el ex legislador fueron atendidos debidamente por la Comisión y ésta le notificó por escrito sus hallazgos, determinaciones y recomendaciones.

A la luz de la normativa expuesta sobre los requerimientos del debido proceso de ley y los acontecimientos procesales seguidos en relación al trámite investigativo que precedió la determinación del Senado de expulsar al ex Senador Nogueras Cartagena, debemos concluir que no hubo violación de los derechos correspondientes que le brinda la Constitución del Estado Libre Asociado. Los planteamientos de violaciones al debido proceso de ley, presentados por el ex Senador Nogueras Cartagena en su recurso son, por lo tanto, improcedentes.

B.   Respecto a los requerimientos de orden sustantivo, por el contrario, entendemos que los planteamientos presentados por Nogueras Cartagena son meritorios. En relación a éstos, el análisis es, aunque de suma importancia, relativamente sencillo. Vista la enumeración taxativa que efectúa la Constitución respecto a las causas que justifican la expulsión de un Senador por el Cuerpo al que pertenece, debemos determinar si la conducta que se le imputó por la Comisión de Ética al señor Nogueras Cartagena, sobre la

cual el Senado tomó la decisión de expulsarlo, se adecúa a dichas causas.

Es aquí, precisamente, donde debemos cerciorarnos de que nuestro ánimo como juzgador esté totalmente carente de apasionamientos producto de consideraciones extrañas a aquellas por las cuales fue juzgado el ex Senador Nogueras Cartagena. Tomamos conocimiento judicial de que, además de los hechos reseñados por la Comisión de Ética, el ex Senador Nogueras Cartagena ha sido objeto de múltiples otros señalamientos, algunos de los cuales constituyen delitos extremadamente serios. No obstante, no es, ni puede ser, en relación a estos últimos acontecimientos sobre los que centremos nuestro análisis. Tampoco podemos permitir que estos hechos minen nuestro ánimo. Estos hechos no estuvieron ante la consideración de la Comisión al ésta emitir su recomendación; tampoco estuvieron ante la atención del Pleno del Senado al decretarse la expulsión. Por lo tanto, no puede ser en relación a estos hechos que se evalúe la corrección de la actuación senatorial. Si así procediéramos, esto constituiría una crasa y patente violación al debido proceso de ley. Sencillamente, en relación a estos asuntos, en el procedimiento de expulsión no se le brindó una notificación adecuada u oportunidad de ser oído al ex Senador Nogueras Cartagena. Es por lo anterior que debe quedar claro que la decisión a la que lleguemos sobre este asunto debe estar basada exclusivamente en los hechos que tuvo ante sí el Senado.

Pasemos a analizar los cargos que le imputó la Comisión al ex Senador Nogueras Cartagena. Al hacerlo reconocemos que, aun cuando fueron varios los cargos imputados al ex Senador, la Comisión fundamentó y centró principalmente su recomendación en la alegada violación a la Ley de Ética Gubernamental. Sin embargo, antes de entrar a dilucidar la procedencia de la imputación de este cargo, es necesario y apropiado analizar y destacar el resto de los cargos presentados por la Comisión de Ética contra el ex

Senador. Aun cuando reconocemos que el cargo que realmente dio base para someter al Senado la moción de expulsión fue el relacionado con las violaciones a la Ley de Ética Gubernamental, no albergamos duda alguna de que la imputación del resto de los cargos pesó indebida, pero sustancialmente, tanto en el ánimo de la Comisión al efectuar su recomendación al Cuerpo del Senado, como en la votación final de sus componentes. Veamos, entonces, la naturaleza y alcance de estos otros cargos.

Como ha quedado dicho, la investigación realizada por la Comisión de Ética surge como consecuencia del Informe de Auditoría CPED-95-16 preparado por la Oficina de la Contralor. El hallazgo principal de este informe gira en torno a la posible violación por parte del ex Senador Nogueras Cartagena a la Ley Núm. 13, *supra.* En lo pertinente, dispone el estatuto lo siguiente:

> En cualquier año natural, los legisladores sólo podrán tener ingresos netos fuera de los de legislador hasta una cantidad no mayor del treinta y cinco por ciento (35%) del total de los salarios que de acuerdo a esta sección les correspondan más los reembolsos por las dietas establecidas en la sec. 29 de este título. En caso de que un legislador reciba ingresos fuera de los de legislador en exceso del treinta y cinco por ciento (35%) antes dispuesto, el legislador deberá restituir o devolver a la Cámara correspondiente los salarios devengados durante el año natural a que corresponda en la proporción que esos ingresos excedan el por ciento antes estatuido, pero nunca más de la mitad de los salarios devengados en dicho año. A los efectos de esta disposición, "ingresos fuera de los de legislador" significará toda compensación, salario, remuneración, honorarios profesionales, beneficios o cualquier otro pago o cantidad que reciba o devengue un legislador por servicios personales prestados y que no sean salarios y reembolsos por dietas dispuestos en las secs. 28 *et seq.* de este título. A los efectos de esta disposición, no se considerarán ingresos fuera de los de legislador los beneficios que éstos reciban por concepto de rentas, intereses, dividendos, pensiones alimenticias, compensaciones por sentencia judicial, premios, transacciones de capital, derechos de autor y patentes, ni el beneficio o compensación de algún plan de pensiones o seguro privado, ni las pensiones del Gobierno de los Estados Unidos de América y las [compensaciones] de sistemas de se-

guro de Gobierno del Estado Libre Asociado de Puerto Rico cuyas aportaciones o primas, en todo o en parte, las hubiere pagado el legislador mismo, o una agencia o entidad gubernamental o una empresa, negocio, comercio, corporación, sociedad, sucesión o cualquier otra entidad a la que el legislador preste o haya prestado servicios personales. *Tampoco se considerarán ingresos fuera de los de legislador aquellas cantidades devengadas por servicios personales prestados con anterioridad a la fecha de vigencia de esta ley, pero que sean pagados al legislador con posterioridad a la efectividad de la misma.* (Énfasis suplido.) 2 L.P.R.A. ant. sec. 28.

Según la propia ley, esta disposición sería efectiva el 2 de enero de 1993. Art. 8 de la Ley Núm. 13, *supra,* 1989 Leyes de Puerto Rico 69. Adviértase que claramente excluye de su aplicación las cantidades devengadas por servicios prestados con anterioridad a la vigencia de la ley, pero pagados con posterioridad a la efectividad de la misma.

El Informe de la Oficina de la Contralor refleja que el ex Senador Nogueras Cartagena sometió una declaración jurada sobre ingresos en la Secretaría del Senado y reportó sus ingresos netos para el año 1993, *certificando que no había recibido ingresos en exceso del treinta y cinco por ciento (35%) sobre su salario como legislador.* En dicha declaración el ex Senador apuntó, sin embargo, que durante el año 1993 recibió un pago de honorarios por los servicios de representación legal a clientes en el Caso Civil Núm. KAC-91-1711 (caso de la Villa Panamericana), pago que ascendía a la cantidad de doscientos mil dólares ($200,000).[7] Alegó el ex Senador que esta cantidad no había sido incluida en la declaración sobre ingresos, por haber sido el pago recibido por servicios prestados antes del año 1993, razón por la cual la cantidad devengada estaba excluida de la declaración, conforme a la ley.

El Informe de la Contralor señaló, contrario a lo alegado

---

[7] Tomamos conocimiento judicial de que con relación a estas gestiones del ex Senador, hay pendiente un procedimiento disciplinario ante el Tribunal Supremo. *In re Lic. Nicolás Nogueras Cartagena,* CP-96-2.

por el ex Senador Nogueras Cartagena, que parte del pago ascendiente a doscientos mil dólares ($200,000), recibido por éste, fue en concepto de servicios prestados *durante* el año 1993, razón por la cual *parte* de estos ingresos debió ser incluida en la declaración jurada requerida para dicho año. *El Informe, sin embargo, no especifica qué cantidad del monto de doscientos mil dólares ($200,000) correspondía al pago de servicios alegadamente prestados durante el año 1993.* Tampoco revela que los alegados servicios prestados durante dicho año por el ex Senador Nogueras Cartagena produjeran alguna cantidad en exceso del treinta y cinco por ciento (35%) permitido por la ley.

La investigación realizada por la Oficina de la Contralor sólo alcanzó a concluir que la representación legal por parte del ex Senador Nogueras Cartagena en el caso de la Villa Panamericana fue una continua desde el año 1991; que a la fecha de la auditoría realizada por la Oficina de la Contralor (13 de marzo de 1995), el ex Senador no había renunciado a la misma, y que, por lo tanto, se imponía la conclusión de que el pago de doscientos mil dólares ($200,000), recibidos por el ex Senador Nogueras Cartagena en el año 1993, incluía una remuneración por gestiones realizadas con posterioridad al 2 de enero de 1993, fecha de vigencia de la Ley Núm. 13, *supra.* Acto seguido, el Informe detalla las gestiones profesionales efectuadas por el ex Senador con posterioridad al 2 de enero de 1993, pero no expresa, en forma alguna, el pago específico recibido o adjudicado a las mismas, como tampoco señala de forma específica si dichos pagos reflejaron un exceso del treinta y cinco por ciento (35%) establecido en la Ley Núm. 13, *supra.*

De los señalamientos contenidos en el Informe de la Contralor antes esbozados, la Comisión de Ética concluyó que era *evidente* que el ex Senador estaba obligado a declarar el monto total de doscientos mil dólares ($200,000) como parte del cálculo de sus ingresos netos correspondien-

tes al año 1993, concluyendo así que dicha actuación constituyó una *clara* violación a la Ley Núm. 13, *supra*.

Esta conclusión no encuentra apoyo en los hechos que tuvo ante sí la Comisión; además, resulta vaga e imprecisa. Un análisis desapasionado de los hallazgos detallados en el Informe de la Contralor nos lleva forzosamente a concluir que éstos no son suficientes para que se pueda llegar a la conclusión de que se violó la Ley Núm. 13, *supra*, y mucho menos apoyan la conclusión de la Comisión de que constituyeron una *clara* violación a dicha ley. Adviértase que del Informe se desprende que sólo parte de la cantidad de doscientos mil dólares ($200,000) podía corresponder a las gestiones realizadas durante el año 1993; de ahí la Comisión concluye, inexplicablemente y en un claro *non sequitur*, que el ex Senador debió declarar el monto total de dicha cantidad. Esta conclusión en forma alguna se ajusta a los hallazgos del Informe de la Contralor. Consideramos imprescindible recalcar, además, que la violación a las disposiciones de esta ley no constituye delito alguno, por lo que, para fines de sostener la expulsión, no puede formar parte de una determinación sobre un patrón de conducta que refleja "ausencia de juicio, menosprecio hacia el bienestar común o falta de respeto por la ley, que implican la carencia del nivel mínimo de integridad y juicio para desempeñar las responsabilidades del cargo que se ocupa". Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton, pág. 498. Por ende, no puede ser considerada como fundamento para avalar la expulsión en el caso de marras.

Pasemos al siguiente cargo imputado. La Comisión concluyó que el ex Senador Nogueras Cartagena violó la anterior Ley de Contribuciones sobre Ingresos de 1954 al rendir tardíamente las planillas correspondientes a los años 1991, 1992 y 1993, acción que conforme a dicho estatuto constituía delito grave. Véase 13 L.P.R.A. ant. sec. 3145(c).

Resulta patentemente contradictorio que la Comisión se ampare en la violación de esta ley como uno de los fundamentos para recomendar la expulsión del ex Senador Nogueras Cartagena cuando, de otra parte, la propia Legislatura, al aprobar el vigente Código de Rentas Internas, define este mismo delito como un delito de naturaleza menos grave. 13 L.P.R.A. sec. 8054 (Sup. especial 1995). Resulta evidente, a nuestro parecer, que los miembros de la Legislatura cambiaron la naturaleza del delito a uno menos grave al considerar que dicha actuación, aunque reprobable, no amerita la calificación de un delito grave. Mucho menos, entonces, debe o puede ser causa que avale la expulsión de uno de sus miembros.

Finalmente, analicemos la naturaleza del cargo por violación a la Ley de Ética Gubernamental. Surge diáfanamente del Informe de la Comisión que fue la alegada violación a este estatuto en la que se fundamentó, principalmente, la recomendación de expulsión presentada al Cuerpo del Senado. Razonó la Comisión que, al estar tipificada como un delito grave la violación a la Ley de Ética Gubernamental, ello acarreaba, por sí sólo, un fundamento razonable en derecho para recomendar la expulsión del ex Senador. Se impone entonces la siguiente interrogante: ¿Incurrió el ex Senador Nogueras Cartagena en conducta constitutiva del delito grave tipificado en el Art. 4.11 de la Ley de Ética Gubernamental, 3 L.P.R.A. sec. 1841? Un análisis minucioso de la ley, así como de los hechos contenidos en el Informe, nos lleva forzosamente a concluir que el ex Senador Nogueras Cartagena no incurrió en conducta constitutiva de este delito. Veamos.

La Ley de Ética Gubernamental impone a determinados funcionarios públicos, y entre ellos a los legisladores, la obligación de presentar los informes financieros ante la Oficina de Ética Gubernamental. 3 L.P.R.A. sec. 1831. No más tarde del 1ro de mayo de cada año, los informes deben ser sometidos a dicha oficina. 3 L.P.R.A. sec. 1832. El in-

cumplimiento con esta obligación se penaliza conforme al Art. 4.11 de la ley, *supra*, que prescribe, en su parte pertinente:

(1) Toda persona que, a sabiendas y voluntariamente, falsifique o *deje de radicar* o divulgar cualquier información sustancial que este subcapítulo le requiere someter, incurrirá en delito grave y convicta que fuere será sancionada por cada violación con pena de reclusión por un término fijo de un (1) año o multa de dos mil (2,000) dólares, o ambas penas a discreción del tribunal. (Énfasis suplido.) 3 L.P.R.A. sec. 1841.

De lo anterior se desprende que los elementos constitutivos del delito grave tipificado en el artículo que precede son los siguientes: a sabiendas y voluntariamente *falsificar o dejar de presentar o divulgar cualguier información requerida por el estatuto.* De entrada, resulta claro del lenguaje de este artículo que una de las conductas penalizadas es *no rendir el informe a la Oficina de Ética Gubernamental.*

El Informe de la Comisión le imputa al ex Senador Nogueras Cartagena, como conducta constitutiva de este delito, haber presentado *tardíamente* los informes correspondientes a los años 1992, 1993 y 1994. Arrojó la investigación que el ex Senador Nogueras Cartagena presentó el informe correspondiente al año 1992 el 15 de septiembre de 1993, el correspondiente al año 1993 el 27 de febrero de 1995, y el correspondiente al año 1994 el 21 de junio de 1995.

Si bien esta actuación refleja un cumplimiento tardío por parte del ex Senador Nogueras Cartagena y una falta de diligencia con relación a su deber ministerial de rendir estos informes, tal conducta no constituye el delito grave tipificado en el Art. 4.11, *supra.* Bajo este estatuto, presentar tardíamente no es igual a dejar de presentar el informe. Esta última conducta es la que el estatuto tipifica como delito.

El principio general de hermenéutica legal nos obliga a rechazar la interpretación de una ley que conduzca a una

conclusión absurda. R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, pág. 242. Véanse, además: *Orta v. Registrador*, 60 D.P.R. 789 (1942); *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328 (1983). De igual forma, conforme al Art. 15 del Código Civil, 31 L.P.R.A. sec. 15, las palabras de un estatuto generalmente han de ser entendidas en su más corriente y usual significado sin atender demasiado al rigor de las reglas gramaticales, sino más bien al uso general y popular de las voces. Bernier y Cuevas Segarra, *op. cit.*, pág. 252. Véanse: *Bird v. Eastern Airlines, Inc.*, 99 D.P.R. 955 (1971); *Arecibo Bldg. Corp. v. Mun. de Arecibo*, 115 D.P.R. 76 (1984). Véase, además, Art. 6 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 3021. Finalmente, es un principio reconocido que el Tribunal Supremo no está autorizado, bajo el pretexto de buscar la intención legislativa en un estatuto, a *adicionarle limitaciones o restricciones que no aparecen en su texto*. Bernier y Cuevas Segarra, *op. cit.*, pág. 260. Véase *Román v. Superintendente de Policía*, 93 D.P.R. 685 (1966). Recoge, además, el principio de legalidad esta norma de interpretación legal al proscribir el instar una acción penal por un hecho que no esté *expresamente* definido como delito o crear éstos por analogía. Art. 8 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 3031.

A la luz de los preceptos antes esbozados es imperativo concluir que, conforme al lenguaje del Art. 4.11, *supra*, es necesario *no haber rendido* los informes requeridos para que se constituya el delito grave tipificado por el estatuto. *El delito no se constituye con la mera presentación tardía de los informes*. A manera de ilustración, comparemos el lenguaje del Art. 4.11, *supra*, con el contenido de la Sec. 6049 del vigente Código de Rentas Internas de Puerto Rico de 1994 (13 L.P.R.A. sec. 8054). Esta sección tipifica como delito menos grave "dejar de rendir planilla" y, en su parte pertinente, dispone:

(a) Cualquier persona que dejare de rendir cualquier plani-
lla o declaración requerida por cualquier Parte de este Subtí-
tulo *dentro del término prescrito* por la Parte correspondiente
de este Subtítulo .... (Énfasis suplido.) 13 L.P.R.A. sec. 8054.

Adviértase la clara diferencia entre este lenguaje y el
lenguaje del Art. 4.11, *supra.* Aquí se penaliza específica-
mente la presentación tardía de la planilla al igual que su
no presentación, mientras que en el Art. 4.11, *supra,* no se
penaliza, expresamente en el estatuto, la presentación tar-
día del informe. Esta distinción es lógica, ya que el rendir
planillas contributivas es un importante eslabón en la re-
colección de los fondos indispensables para el manejo y sos-
tenimiento del Gobierno. Tan es así, que para el año en
curso esta partida constituyó el cincuenta y siete punto
siete por ciento (57.7%) de los ingresos del fisco.[8] El que se
rindan a tiempo resulta imprescindible. Esta, definitiva-
mente, no es la situación con relación a los informes que se
exigen al amparo de la Ley de Ética Gubernamental.[9]
Este ejemplo nos parece revelador de la intención legisla-
tiva al aprobar ambos estatutos, estableciendo una clara
diferencia en la constitución de los delitos que ambos
proscriben. Cabe señalar que aun cuando nos parece claro
el lenguaje del Art. 4.11, *supra,* resulta revelador el que
tampoco se desprenda de su historial legislativo la inten-
ción de instituir como delito la presentación tardía de los
informes ante la Oficina de Ética Gubernamental.[10]

Concluimos, por lo tanto, que el ex Senador Nogueras
Cartagena no incurrió en conducta constitutiva del delito
estatuido en el Art. 4.11 de la Ley de Ética Gubernamental,
*supra.* Siendo así, erró la Comisión al fundamentar su re-

---

[8] Información disponible en la Oficina de Presupuesto y Gerencia.

[9] Cabe señalar que a pesar de que el dejar de rendir planillas contributivas a
tiempo constituye un delito, el ejecutivo, correctamente, en muy raras ocasiones
encausa a una persona por este delito. Esta medida sólo la usa en casos extremos.

[10] Tomamos conocimiento judicial del hecho de que varios Senadores y Repre-
sentantes han presentado tardíamente sus informes financieros ante la Oficina de
Ética Gubernamental y que ninguno de ellos ha sido encausado criminalmente por
este hecho.

comendación al Cuerpo del Senado en la alegada comisión de este delito grave.

Es importante recordar que este Tribunal, en *El Vocero de P.R. v. Nogueras I*, 138 D.P.R. 103 (1995), aceptó la determinación del Director de la Oficina de Ética Gubernamental de que la presentación *tardía* del informe financiero de 1993 por el ex Senador Nogueras Cartagena cumplía con el deber ministerial impuesto por el Art. 4.1 de la Ley de Ética Gubernamental, 3 L.P.R.A. sec. 1831. En el caso que nos ocupa, no encontramos circunstancia alguna que nos lleve a acoger la conclusión opuesta a la anterior y en la cual se basó el Senado para expulsar al ex Senador Nogueras Cartagena.

C. Además, aun cuando aceptáramos que la conducta del ex Senador Nogueras Cartagena en este caso constituyó el delito grave tipificado en el Art. 4.11 de la Ley de Ética Gubernamental, *supra*, entendemos que no es de los delitos que dan base a la expulsión al amparo de las Secs. 9 y 21 del Art. III de la Constitución del Estado Libre Asociado, *supra*.

Conociendo el esquema de expulsión de legisladores establecido por la Constitución federal, nuestra Asamblea de Constituyentes optó por uno más restrictivo, *distinto* al federal. Específicamente, y contrario a lo establecido en la Sec. 5 del Art. I de la Constitución federal,[11] la Constitución del Estado Libre Asociado, en la Sec. 21 del Art. III, *supra*, pág. 347, especifica cuáles serán las únicas causas de expulsión de un legislador: "la traición, el soborno, otros delitos graves, y aquellos delitos menos grave que impliquen depravación." Para fines de resolver la presente controversia, debemos delinear el significado de la frase "otros delitos graves". Al hacerlo entendemos que el calificativo

---

[11] En dicha sección, la Constitución federal dispone: "Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member." Const. EE. UU., Art. I, Sec. 5, U.S.C., pág. LIV.

"otros" delimita sustancialmente la gama de delitos por los que puede ser expulsado un legislador, atando el contenido de la frase "delitos graves" a la naturaleza de los delitos nombrados en la exposición, a saber, la traición y el soborno. Es, por lo tanto, prudente auscultar la naturaleza de estos delitos para poder reconocer a cabalidad el alcance de la frase "otros delitos graves".

El delito de soborno, por su parte, aparece tipificado en la sección duodécima del Código Penal puertorriqueño, destinada a aquellos delitos que atentan contra la función pública. "Esta sección tipifica los delitos que violan el orden moral y los valores fundamentales de la administración pública puertorriqueña." *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748, 755 (1985).

El delito de soborno ocurre cuando un funcionario público, entre otros, "solicit[a] o recib[e], directamente o por persona intermedia, para sí o para un tercero, dinero o cualquier beneficio, o acept[a] una proposición en tal sentido, por realizar un acto regular de su cargo o función ...". Art. 209 del Código Penal de 1974, según enmendado por la Ley Núm. 101 de 4 de junio de 1980 (33 L.P.R.A. sec. 4360). Sobre este delito se ha dicho que "[l]a redacción presente del Código sigue la línea de la tradición civilista al definir el delito de cohecho o corrupción activa ...". D. Nevares-Muñiz, *Código Penal de Puerto Rico*, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1995, pág. 339. Hemos tenido la oportunidad de auscultar su carácter antiquísimo. Al respecto señalamos que:

> Por siglos los pueblos han penalizado el soborno y sus distintas modalidades. El "cohecho" español; la *corruption* francesa, la *corruzione* italiana, el *bribery* angloamericano constituyen delitos de origen muy antiguo. En Roma se denominó este delito como crimen *repetundae*, por el cual las personas afectadas tenían una acción legal para recuperar lo que el funcionario obtuvo. En las XII Tablas se consideró capital el hecho de que el juez recibiera dinero por dictar sentencia. Posteriormente, en tiempos de Cicerón, fue atenuada la pena, para ser agravada

nuevamente por Valentino. Justiniano modificó las penas en la Novela 12.

Aunque en Inglaterra el delito fue originalmente limitado para cubrir a los jueces que en el desempeño de sus funciones aceptaban regalos, con el tiempo el castigo se extendió a todas las ramas de gobierno.

En España este delito se le conoce como el "cohecho". Y en su Código Penal se tipifican tres tipos de cohecho: el pasivo, el activo, y el que comete un funcionario cuando se abstiene de un acto regular de su cargo. (Citas y notas omitidas.) *Pueblo v. Bigio Pastrana*, supra, pág. 754.

Citando al profesor Miró Cardona, en *Pueblo v. Bigio Pastrana*, supra, pág. 755, resaltamos los fundamentos del delito. Al señalar que esta sección del Código protege la administración pública, dijimos que " '[é]sta no sufre quebrantos en su patrimonio con la actividad deshonesta de sus servidores; pero la venalidad de los mismos, que se enriquecen prevaliéndose de la autoridad del cargo que desempeñan y de las funciones que ejercen, lesionan con su conducta la dignidad y el decoro de la Administración pública' ". Íd. Se castiga con este delito la pretensión del funcionario de lucrarse o beneficiarse injustificadamente por el sólo hecho de ocupar un cargo público. Esta actuación claramente atenta contra la confianza pública depositada en el funcionario al ser electo o designado a ocupar el cargo, cuyo adecuado ejercicio no puede depender de que el funcionario reciba favores a cambio.

La traición, por su parte, no está específicamente tipificada como delito en nuestro ordenamiento. Sin embargo, el término recoge un concepto con un profundo arraigo en la historia de Estados Unidos. Persigue salvaguardar la integridad del Gobierno y ha sido tipificado en el ordenamiento federal. Allí se dispone que:

Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined under this title but not less than $10,000;

and shall be incapable of holding any office under the United States. 18 U.S.C. sec. 2381.([12])

Los tribunales federales han señalado que "la traición es la ofensa más seria que se pueda cometer contra los Estados Unidos". (Traducción nuestra.) *Stephan v. United States*, 133 F.2d 87, 90 (6to Cir.1943). La trascendencia de esta disposición ha sido resaltada de la forma siguiente:

> "Under the laws of the United States the highest of all crimes is treason. It must be so in every civilized state; not only because the first duty of a state is self-preservation, but because this crime naturally leads to and involves many others, destructive of the safety of individuals and of the peace and welfare of society. This crime is defined by the constitution itself, and its magnitude, as well as the importance of a fit and rigid definition of it, may be inferred from the fact that it is the only offense defined by that instrument." Charge to Grand Jury, C.C.Mass. 1851, 2 Curt. 630, 30 Fed.Cas.No. 18269. 18 U.S.C. sec. 2381 n. 31 (ed. 1970).

Prohíbe, pues, la ejecución de conducta lesiva a la integridad estatal e institucional y, por lo tanto, al bienestar de la comunidad en general. Al cometer un acto de traición se pone en peligro la permanencia del Estado y, por consiguiente, el funcionario lesiona la confianza depositada por el público en él o ella. Se espera que el funcionario ocupe su posición para proteger la integridad del Estado al cual sirve, no para ponerlo en peligro.

Contra este marco normativo respecto a la traición y el soborno, debemos analizar el cargo imputado al ex Senador Nogueras Cartagena referente al Art. 4.11(a) de la Ley de Ética Gubernamental, 3 L.P.R.A. sec. 1841(a). Como ha quedado dicho, incurre en este delito la persona que, obligada a cumplir los requerimientos impuestos por dicha ley,

---

([12]) El mismo sentido le confieren al término los diccionarios legales. Se define "traición" como "attempting by overt acts to overthrow the government of the State to which the offender owes allegiance; or of betraying the state into the hands of a foreign power". H.C. Black, *Black's Law Dictionary*, 5ta ed., Ed. West Publishing Co., 1979, pág. 1345. El término es también definido por la Constitución federal. Art. III, Sec. 3, Const. EE. UU., L.P.R.A., Tomo 1.

"a sabiendas y voluntariamente, falsifique o deje de radicar o divulgar cualquier información sustancial que este subcapítulo le requiere someter ...". Íd. Sobre el particular hemos resuelto que "[r]endir los informes financieros requeridos por este ordenamiento constituye claramente una obligación legal que surge del cargo público y no admite discreción en su ejecución. Su incumplimiento constituye un delito grave que, de probarse, impide que un miembro de la Asamblea Legislativa pueda postularse nuevamente". *El Vocero de P.R. v. Nogueras II*, 138 D.P.R. 642, 647 (1995). La ley tiene el loable propósito de "promover y preservar la integridad de los funcionarios e instituciones públicas del Gobierno del Estado Libre Asociado de Puerto Rico". Exposición de Motivos de la Ley Núm. 12, *supra*, 1985 Leyes de Puerto Rico 708. Trata de atender situaciones "en que, por desventura, surgen unas acciones improcedentes por parte de algunos funcionarios que, al incurrir en claras faltas a las normas de ética, ponen en riesgo la estabilidad del soporte moral del Estado. Es intolerable que existan funcionarios públicos en representación de la administración del Gobierno que puedan lucrarse del patrimonio del pueblo". Exposición de Motivos de la Ley Núm. 12, *supra*, pág. 709. La ley pasa luego a atender esta situación. Es dentro de este contexto que se tipifica como delito la conducta de dejar de presentar los informes financieros. Aunque tipifica una conducta que sin duda alguna atenta contra la función pública, no es de la misma naturaleza, seriedad y envergadura que la traición y el soborno. Por lo tanto, no es de los delitos considerados en la Sec. 21 del Art. III de la Constitución del Estado Libre Asociado, *supra*, bajo "otros delitos graves" que dan base a una expulsión. Por consiguiente, forzoso es concluir que el Senado actuó inconstitucionalmente al expulsar al ex Senador Nogueras Cartagena.

# VI

Debe quedar claro que reconocemos la deseabilidad y necesidad de que cada cámara legislativa, como cualquier otro grupo, posea la facultad de disciplinar a sus miembros. Así lo dispone claramente la Constitución en su Art. III, Sec. 9, *supra.* En conformidad con dicha facultad y de acuerdo con el Art. 16 de la Ley de Ética Gubernamental, *supra*, el Senado pudo haber disciplinado al ex Senador Nogueras Cartagena de otra forma, con otros castigos, sin tener que recurrir al extremo de la expulsión; pudo haber emitido una amonestación, una reprimenda pública o un voto de censura, lo pudo haber destituido de rango parlamentario y/o le pudo haber impuesto una suspensión temporera de sus funciones y su sueldo como Senador.

El remedio de expulsión, aunque reconocido por el Constituyente, fue conferido con reservas y limitaciones a cada Cámara. Como su ejercicio arbitrario puede trastocar el orden gubernamental representativo, se requirió la concurrencia de *tres cuartas (3/4) partes* del número *total de los miembros*[13] de que se compone la cámara que promueve la

---

[13] Este alto porcentaje no siempre garantiza que la expulsión de un legislador responda al concenso multipartidista de voluntades. Aun cuando aplicase la garantía constitucional de representación minoritaria, podrían surgir situaciones en las que el partido mayoritario ocupe tres cuartas (3/4) partes de los escaños legislativos y pueda, por lo tanto, lograr la expulsión sin necesitar la concurrencia de los miembros de los partidos minoritarios.

La Constitución, en la Sec. 7 del Art. III de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, le ofrece a los partidos minoritarios la garantía de un número de escaños en las Cámaras legislativas. La garantía se activa sólo bajo determinadas circunstancias y no siempre le asegura a los partidos de minoría un número de escaños igual a la tercera parte del número total de miembros. La garantía contenida en la Sec. 7 del Art. III de la Constitución, *supra*, establece dos (2) situaciones en las cuales se aumentará el número de miembros de las Cámaras. La activación de la garantía siempre requiere que un sólo partido elija más de dos terceras (2/3) partes de los escaños de que originalmente está compuesta la Cámara. Cuando esto ocurre, se aumenta el número de miembros en dos casos. Por ejemplo, el inciso (a) de la sección aplica cuando el candidato a Gobernador por el partido de mayoría obtiene menos de dos terceras (2/3) partes del número total de votos emitidos para dicho cargo. En estos casos se aumenta el número de escaños correspondiente a los partidos minoritarios hasta un máximo de nueve (9). Bajo este supuesto, la representación porcentual de la mayoría podría variar desde sesenta y seis punto sesenta y siete por ciento (66.67%) o dos terceras (2/3) partes de los escaños, hasta

expulsión y se refiere a las causas para autorizar juicios de residencia, especificadas en la Sec. 21 del Art. III de la Constitución del Estado Libre Asociado, *supra.* Estas limitaciones a la facultad de expulsión contenidas en nuestra Constitución son significativas. Para reconocer su alcance debemos sólo recordar que otras constituciones, que tuvo ante sí el Constituyente al aprobar esta disposición, no tenían estas restricciones. Así, por ejemplo, la Constitución federal, en la Sec. 5 de su Art. I, *supra*, reconoce el poder de cada Cámara congresional de expulsar a sus miembros por "conducta desordenada" (*disorderly behavior*), con la concurrencia de dos terceras (2/3) partes, sin especificar si el mismo es del número total de los miembros. La disposición constitucional no refiere a las causas de residenciamiento, que también se enumera en el Art. II, Sec. 4 de la Constitución de Estados Unidos como razones para justificar la expulsión. Este esquema de mayor grado de liberalidad es el que también encontramos en todas las constituciones estatales(14) y el que le fue recomendado a la Asamblea Constituyente por la Escuela de Administración Pública de la Universidad de Puerto Rico. Allí se dijo que:

> El poder de suspender o expulsar a sus miembros ha sido usado por las legislaturas en muy pocas ocasiones. *Quizás no sea conveniente que una constitución intente enumerar las causas de suspensión y expulsión. Sin embargo, debe incluirse la regla de las dos terceras partes, pues de ese modo se otorga cierta protección a los miembros contra posibles excesos de la mayoría.* (Énfasis suplido.) *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, pág. 379.

---

setenta y cinco por ciento (75%) o tres cuartas (3/4) partes. O.E. Resumil de Sanfilippo y R. Faría González, *La garantía constitucional a la representación de las minorías en la Asamblea Legislativa: naturaleza, alcance y extensión*, 65 Rev. Jur. U.P.R. 329, 343–344 (1996). Vemos así que, en los casos en que nos enfrentamos al último extremo mencionado, la representación mayoritaria sería igual a tres cuartas (3/4) partes, el total requerido para lograr la expulsión. Igual situación podría darse bajo el inciso (b) de la Sec. 7 del Art. III de la Constitución del Estado Libre Asociado, *supra*.

(14) *Constitutions of the United States,* Nueva York, Oceana Publications, Inc., Dobbs Ferry 1962.

Es muy ilustrativo que, frente a este marco de referencia, nuestro Constituyente decidió imponer las restricciones que ya hemos citado, descartando así los esquemas adoptados en otras jurisdicciones. Se impone la conclusión de que el poder de expulsión conferido en nuestra Constitución debe ser utilizado cautelosamente y sólo en circunstancias extremas que queden plenamente justificadas dentro del esquema constitucional.

Así lo señaló específicamente el Constituyente en el informe presentado por la Comisión de la Rama Legislativa el 7 de diciembre de 1951. Sobre el procedimiento de expulsión, dijo el Constituyente:

> En segundo lugar, y relacionado con el procedimiento de expulsión de miembros de las cámaras, es el criterio de la Comisión que debe ser responsabilidad de los electores, dentro de los procedimientos ordinarios de elección, determinar si un legislador debe o no volver a ocupar su cargo. Defender ese principio conlleva reconocer la autoridad democrática final del pueblo para entender en estos problemas. Considerando, sin embargo, que puede haber situaciones especiales que hagan imperativa la expulsión de un legislador por sus compañeros de cámara, la Comisión recomienda se permita tal procedimiento, rodeándolo de dos garantías básicas: exigir la aprobación de dos terceras partes de los miembros y estipular en la constitución las causas de expulsión, que deben ser las mismas que motivan el residenciamiento. Diario de Sesiones, *supra*, Vol. 4, pág. 2581.[15]

Estamos ante un poder de significativas y serias repercusiones al sistema republicano de gobierno, ya que al ejercitarlo se priva a un grupo del electorado de la representación que en las urnas escogió y que, en el caso particular de autos, aportó 139,813 votos a favor de que el ex Senador Nogueras Cartagena ocupara un escaño en el Senado de Puerto Rico.[16] Esto entraña que, al ejecutarlo, debe ac-

---

[15] Aun con la anterior recomendación, el número de miembros requeridos para conseguir la expulsión fue aumentado a tres cuartas (3/4) partes.

[16] La cita fue obtenida de la publicación emitida por la Comisión Estatal de Elecciones, *Resultados finales escrutinio o recuentos Isla, por precinto y por munici-*

tuarse con gran prudencia, atendiendo cabalmente las limitaciones impuestas en la Constitución para sostener su validez.

No podemos, por lo tanto, estar de acuerdo con que dejar de presentar una planilla informativa sea suficiente en derecho para justificar una expulsión. Mucho menos puede justificarla la presentación tardía de dicha planilla, no sólo porque esta conducta no está tipificada como delito, y así sostenerlo violaría el principio de legalidad, sino también porque no puede sostenerse que esta conducta constituye la "situación especial" prevista por el Constituyente. Concluimos que la actuación del Senado al expulsar al ex Senador Nogueras Cartagena fue inconstitucional, por lo que disentimos del resultado al que llega una mayoría del Tribunal hoy.[17] Por consiguiente, concederíamos el auto de *mandamus* solicitado y ordenaríamos que se le reconozcan al ex Senador Nogueras Cartagena todos sus derechos, atributos, prerrogativas y privilegios como miembro del Senado del Estado Libre Asociado de Puerto Rico.

## — O —

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

Por estar conforme con los señalamientos formulados por la Juez Asociada Señora Naveira de Rodón en su opinión disidente en este caso, he suscrito dicha opinión. En

---

*pios elecciones generales*, 3 de noviembre de 1992. Con relación a los resultados para candidatos a Senador por Acumulación, el ex Senador Nogueras Cartagena obtuvo la sexta posición de un total aproximado de catorce (14) candidatos participantes en dicha elección general para el escaño de Senador por Acumulación.

[17] También rechazamos la posición de la mayoría de que la determinación del Senado de expulsar al ex Senador Nogueras Cartagena merece una deferencia especial, de la naturaleza que una mayoría de este Tribunal le ha extendido. No olvidemos que nuestra función, como últimos intérpretes de la Constitución, nos obliga a evitar que interpretaciones y aplicaciones erróneas de cláusulas constitucionales "lleve[n] a resultados absurdos o contrarios a los valores fundamentales consagrados en este documento". *Nogueras v. Hernández Colón*, 127 D.P.R. 405, 412 (1990).

ella se expresan claramente las razones jurídicas que sostienen nuestro compartido criterio de que el Senado de Puerto Rico no tiene autoridad para expulsar de ese Cuerpo a uno de sus miembros sólo porque éste haya rendido tardíamente los informes financieros requeridos por ley.

Aunque me he unido a la referida opinión, he creído conveniente añadir por separado unos breves señalamientos para traer a colación varios datos que ofrecen una perspectiva adicional a ese asunto.

1. *El poder de expulsión sólo existe para situaciones extremas*

El historial de la Cl. 9 del Art. III de nuestra Constitución, L.P.R.A., Tomo 1, que establece el poder de expulsión de la cámara legislativa, no deja lugar a duda alguna de que los que redactaron nuestra Ley Fundamental ordenaron un poder muy limitado, para utilizarse sólo en casos extremos. Su clara intención fue que dicho poder se disponía únicamente para *"situaciones especiales que hagan imperativa la expulsión de un legislador ..."*. 4 Diario de Sesiones de la Asamblea Constituyente 2581 (1952).

Como sólo se quería establecer un poder limitado, para casos extremos, los miembros de la Constituyente deliberadamente *no adoptaron* en nuestra Ley Fundamental el poder de expulsión mucho más amplio que tienen las Cámaras del Congreso de Estados Unidos. Esas Cámaras legislativas, sin embargo, aun teniendo un amplio poder de expulsión, claramente mayor que el de las nuestras, lo han usado *únicamente* en los casos más extremos. En el Congreso han ocurrido expulsiones de legisladores sólo en *dos tipos de situaciones*: (1) en casos de *traición*, y (2) en casos en que el congresista había sido *convicto* judicialmente por actos conjuntos de *soborno, extorsión y corrupción*. L. Krugman Ray, *Discipline Through Delegation: Solving the*

*Problem of Congressional Housecleaning*, 55 U. Pitt. L. Rev. 389 (1994).

Si el Congreso de Estados Unidos, que tiene una facultad más amplia que la de nuestra Legislatura para expulsar a sus miembros, solamente lo hace en casos extremos, en los cuales los legisladores han perpetrado los más siniestros delitos contra la confianza pública, ¿cómo es posible que nuestro Senado pretenda expulsar a un miembro sólo porque presentó tarde unos informes financieros?

2. *La presentación tardía es permisible y no constituye causa para expulsión*

En su opinión disidente que comparto, la Juez Asociada Señora Naveira de Rodón explica claramente por qué es que la presentación tardía de los informes financieros en cuestión no constituye delito. A ello puede añadirse que tal presentación tardía, aunque obviamente no es el mejor curso de acción, está *permitida* jurídicamente, y que el que presenta tarde su informe financiero, *cumple* aun así con el deber que fija la ley.

Hace escasamente un año, *en un caso que involucraba precisamente al Senador Nicolás Nogueras*, este Tribunal aceptó expresamente que Nogueras había cumplido con el deber de ley de presentar un informe financiero, aunque lo había sometido tardíamente. Esa había sido la posición no sólo del Director de la Oficina de Ética Gubernamental, *sino del propio Senado de Puerto Rico* en su comparecencia ante nos. *El Vocero de P.R. v. Nogueras II*, 138 D.P.R. 642 (1995). Si este Tribunal, la Oficina de Ética Gubernamental y el Senado de Puerto Rico aceptaron entonces que Nogueras había cumplido con la ley al presentar el informe tardíamente, ¿cómo es posible que ahora se resuelva que puede expulsársele del Senado por ello?

Al ponderar si la presentación tardía de unos informes financieros constituye una ofensa pública tan grave que

justifique la medida extrema de expulsión, debe tenerse en cuenta que en años pasados tal práctica ha ocurrido con alguna frecuencia entre los legisladores del país. Nogueras no es el único que ha sometido informes tardíos. De hecho, aunque el deber de rendir tales informes se estableció por ley en 1985, hasta el 1993, *por espacio de siete años, los miembros del Senado de Puerto Rico no presentaron tales informes en la Oficina de Ética Gubernamental.* Ello provocó que el periódico *El Vocero de Puerto Rico* exigiera judicialmente que se cumpliera con la ley. *El Vocero de P.R. v. Hernández Agosto,* 133 D.P.R. 413 (1993). El cumplimiento irregular y accidentado por los legisladores del país —del requisito de presentar informes financieros— es otro elemento más, pues, que demuestra que no tiene sentido jurídico considerar la presentación tardía de estos informes como fundamento suficiente para decretar la medida extrema de expulsar de un escaño a un legislador electo por la voluntad de miles de votantes.

A la luz de lo anterior, y de lo expuesto por la Juez Asociada Señora Naveira de Rodón en su opinión disidente, es verdaderamente lamentable que una mayoría de este Tribunal se haya plegado, por diversas razones y motivos, al dictamen senatorial y que lo convalide, aunque jurídicamente es claro que el mismo constituye un ominoso e ilegal abuso de poder.